BAY RIDGE DIAGNOSTIC LABORA-
TORY, INC., et al., Plaintiffs,

v.

James R. DUMPSON, Commissioner of
Social Services and Administrator for
Human Resources of the City of New
York, et al., Defendants.

No. 75 C 640.

United States District Court,
E. D. New York.

Aug. 14, 1975.

Sanford S. Kantor, New York City,
for plaintiffs.

W. Bernard Richland, Corp. Counsel,
New York City by Edward I. Lieber-
man, Philip Agree and Elliot Tunis, Asst.
Corp. Counsel, New York City, for de-
fendants.

John B. Rhinelander, Gen. Counsel,
Dept. of Health, Ed. & Welfare, Wash-
ington, D. C. by Ronald Sutter, Atty.
Dept. of Health, Ed. and Welfare, and
David G. Trager, U. S. Atty., E.D.N.Y.,
Brooklyn, N. Y. by Cyril Hyman, Asst.
U. S. Atty., for the Secretary of Health,
Ed. and Welfare, amicus curiae.

Patricia A. Butler, Stanton J. Price,
and Lawrence R. Mullen, Los Angeles,
Cal., for Nat. Health Law Program,
amicus curiae.

Stanley D. Friedman, New York City,
for New York State Society of Patholo-
gists, amicus curiae.

MEMORANDUM and ORDER

WEINSTEIN, District Judge.

This is a motion for a preliminary in-
junction. Initial evidentiary hearings

have been held, but a full trial on the merits will be required. See Rule 65(a)(2), Federal Rules of Civil Procedure. Plaintiffs have shown a substantial probability of success on the merits and a high probability of irreparable injury unless immediate relief is granted. *See, e. g., Inmates of Attica Correctional Facility v. Rockefeller,* 453 F.2d 12, 20 (2d Cir. 1971); *Clairol, Inc. v. Gillette Co.,* 389 F. 2d 264, 265 (2d Cir. 1968); *Bass v. Richardson,* 338 F.Supp. 478 (S.D.N.Y.1971). As indicated below, the court must exercise its equitable powers to minimize burdens on the parties while the litigation is prosecuted to completion as speedily as circumstances permit.

This memorandum, with its findings of fact and law, is based on preliminary hearings only and is not a decision on the merits in any respect. It does not include a full discussion of the substantial ethical, economic and social factors involved. The court's oral statements at the hearings outlined some of the complex issues posed which need not be decided at this preliminary stage of the litigation.

Plaintiffs, seven clinical laboratories presently licensed to provide services under subchapter XIX of chapter 7 of Title 42 of the United States Code (Medicaid), have brought an action to enjoin a New York City program in which exclusive contracts for all Medicaid services will be let after competitive bidding to one laboratory for each of four of the City's five boroughs. Under the terms of these contracts, each of the four contracting laboratories would become the exclusive provider of Medicaid laboratory services in one of the four boroughs. Each laboratory would establish a station for collection of specimens and a Medicaid recipient could not seek laboratory services available at the central laboratory from any other laboratory, regardless of the patient's or doctor's preference.

Plaintiffs file this suit on behalf of themselves and approximately three hundred similarly-situated laboratories doing Medicaid work in New York City. They allege that a large number of these laboratories would be forced out of business by the city's single-contract competitive bidding plan.

Plaintiffs' primary contention is that the City's proposal would impair Medicaid recipients' right under Medicaid statutes to free choice of persons and institutions providing medical services, including laboratory services. It is this contention that is of central concern to the court, although plaintiffs include additional claims that under Medicaid statutes only one agency (the state) may supervise the Medicaid assistance program, that the City's proposal would violate the Sherman Antitrust Act (15 U.S. C. §§ 1 and 2), and that it would deprive the plaintiffs of Fourteenth Amendment rights of due process and equal protection.

I. *Statutory Framework*

Medicaid is the program of federal medical assistance for the poor and medically needy adopted in 1965. *See, generally,* Rosenblatt, Book Comment: Dual Track Health Care: The Decline of the Medicaid Cure, 44 U.Cin.L.Rev. 643 (1975) on R. and R. Stevens, Welfare Medicine in America: A Case Study of Medicaid (1974). It is financed by federal, state, and municipal funds and administered by each participating state. A state must submit a plan for approval by the federal Department of Health, Education and Welfare ("HEW") that complies with requirements of federal law. The federal statute (42 U.S.C. § 1396 *et seq.*) requires that states provide at least seven basic services: physician services, inpatient and outpatient hospital services, nursing home services, child health screening, and x-ray and laboratory services. 42 U.S. C. §§ 1396a(a)(13)(C)(i), 1396d(a)(1)–(5). These services must be available to at least all recipients of federal welfare programs (Aid to Families with Dependent Children, 42 U.S.C. § 601 *et seq.* and Supplemental Security Income for the Aged, Blind and Disabled, 42 U.S.C.

§ 1381 *et seq.*). States may provide additional services, such as dental care and drugs, and may include as Medicaid recipients "medically needy" individuals meeting the characteristics of welfare recipients (old age, blindness, disability, or childhood dependence), but whose incomes or resources are slightly above welfare eligibility levels. New York provides under its Medicaid plan for the mandatory medical services, as well as many optional ones, on behalf of both welfare recipients and the medically needy. 52A N.Y. Social Welfare Law §§ 363–369 (McKinney's Consol.Laws, c. 55, 1966). Costs of the program are shared by the United States, New York State, and New York City in the ratio of approximately 50%, 25% and 25%, respectively.

The acknowledged purpose of the Medicaid program was to bring the poor into the mainstream of American medical services. Hearings Before the Subcommittee on Medicaid and Medicare of the Senate Finance Committee, 91st Cong., 2d Sess., pt. 1 at 57 (1965). Congress required that the program be in effect in all parts of the participating state (42 U.S.C. § 1396a(a)(1)); that services be made available promptly (42 U.S.C. § 1396a(a)(8)); that services for which the state pays be comparable for covered groups (42 U.S.C. § 1396a(a)(10)(B)); and that the program be administered in the "best interests of the recipients" (42 U.S.C. § 1396a(a)(19)). In 1968, Congress added provisions establishing a system of reviewing use and quality of care. 42 U.S.C. § 1396a(a)(30)–(31). It permitted Medicaid recipients to choose health care providers according to their own preference. 42 U.S.C. § 1396a(a)(23). Section 1396a(a)(23) is commonly referred to as the "freedom of choice" provision.

When a state plan is filed that meets the requirements of both 42 U.S.C. § 1396a(a) and federal implementing regulations, the Secretary of HEW must approve it. 42 U.S.C. § 1396a(b). Once a state's plan has been approved, the Secretary, pursuant to 42 U.S.C. § 1396b, reimburses the state for a substantial portion of the costs it incurs in providing medical assistance. Each state has the responsibility of administering its own medical assistance program, with HEW's role largely restricted to disbursing funds.

No exhaustion of administrative remedies or delegation issues are raised in this case since there is no supervisory or regulatory administrative agency involved, but rather a Congressionally-established financial disbursement scheme, where federal, state and municipal agencies perform disbursement, not regulatory functions. In addition, such review powers over programs as the Secretary of HEW possesses under 42 U.S.C. § 1396c only become operative *after* a program is actually implemented and, even then, only after extensive administrative review. Plaintiffs would be irreparably harmed if they were required to await implementation and HEW review. The question here is thus one of statutory interpretation, not of administrative agency review. All parties, including HEW, concur that this court has jurisdiction which should be exercised now. *See, Almenares v. Wyman*, 334 F.Supp. 512 (S.D.N.Y.1971), modified at 453 F.2d 1075 (2d Cir.) *cert. den.*, 405 U.S. 944, 92 S.Ct. 962, 30 L.Ed.2d 815 (1972).

II. *"Freedom of Choice" Provision*

As noted above, plaintiffs contend that the proposed New York City program, which would have the effect of requiring City Medicaid recipients to obtain laboratory services from a designated laboratory within the borough of their residence, conflicts with the "freedom of choice" provision of 42 U.S.C. § 1396a(a)(23). That section provides in relevant part:

"A State plan for medical assistance must—

. . . . .

(23) provide that any individual eligible for medical assistance (including

drugs) may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required (including an organization which provides such services, or arranges for their availability, on a prepayment basis), who undertakes to provide him such services . . . ."

Thus, in view of this statutory language, plaintiffs' success in this suit necessarily depends on whether laboratory services are a form of "medical assistance" and whether a laboratory is an "institution, agency, community pharmacy, or person." The plaintiffs and the Secretary of HEW, acting as an amicus at the court's request, submit that both of these inquiries must be answered in the affirmative and that, therefore, plaintiffs come within the purview of the provision's "freedom of choice" guarantee. Their argument is summarized in the paragraphs below.

The term "medical assistance" is defined at length in 42 U.S.C. § 1396d(a). Paragraph (3) expressly includes "laboratory and x-ray services" within that definition. Clearly, then, the services provided by plaintiffs come within the scope of "medical assistance" under Subchapter XIX.

On first reading it would appear to be possible to interpret the language of Section 1396a(a)(23) to exclude clinical laboratories as providers coming within its purview. Plaintiffs are not institutions, agencies, or community pharmacies, and if the term "person" is interpreted to mean "natural person," plaintiffs, as corporations, would not fit within any of the providers as to which freedom of choice is guaranteed. Plaintiffs and the Secretary submit that such a narrow reading of the word "person" will not withstand analysis. Federal law expressly states that "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise— . . . the words 'person' and 'whoever' include corporations . . . as well as individuals . . . ." 1 U.S.C. § 1.

In the instant case, there is nothing in "the context" of the specific statutory provision or in Subchapter XIX to suggest that the intended scope of the word "person" is confined to "natural persons." What evidence is available in the legislative history of Section 1396a(a)(23) all tends in the opposite direction. Both the House and Senate Reports accompanying H.R. 12080 state the purpose of the provision in broad, general terms. Thus, they announce that the provision is being included in order to provide Medicaid recipients with "freedom in their choice of *medical institution* or *medical practitioner*." H.R.Rep.No.544, 90th Cong., 1st Sess. 122 (1967); S. Rep.No.744, 90th Cong., 1st Sess. 183 (1967) U.S.Code Cong. & Admin.News, 1967, pp. 2834, 3021 (Emphasis added). The Reports also state expressly that "[u]nder this provision an individual is to have a choice from among qualified providers of services" (H.R.Rep.No.544, 90th Cong., 1st Sess. 122 (1967); S.Rep. No.744, 90th Cong., 1st Sess. 183 (1967)), U.S.Code Cong. & Admin.News, 1967, pp. 2834, 3021, suggesting, in effect, that the individual's freedom of choice extends to all qualified providers of service and indicating that Congress did not intend a narrow interpretation of the provision's language.

Moreover, throughout the Social Security Act, Congress, when it intended to refer to a "natural person," has consistently used the word "individual." Thus, even Section 1396a(a)(23) begins with the words "any *individual* eligible for medical assistance . . . ." (Emphasis added). Given this uniform usage of the word "individual" to convey the meaning of "natural person," it is evident that Congress, when it chose to employ the word "person," intended to include not only a natural person but an artificial person such as a corporation. Plaintiffs, as such "persons," come within the purview of providers as to which the statute guarantees freedom of choice.

HEW—consistent with the statements in the House and Senate Reports—has

always interpreted Section 1396a(a) (23) to assure freedom of choice as to all qualified providers of medical services willing to render services in accordance with the fee schedules established by the state. The germ of this policy can be seen in the *Handbook of Public Assistance Administration;* even prior to the enactment of the statutory provision in question, in early 1967 it stated:

"A state plan for medical assistance must provide that:

"1. Fee structures will be established which are designed to enlist participation of a sufficient number of providers of services in the program so that eligible persons can receive the medical care and services included in the plan at least to the extent these are available to the general population." *Handbook of Public Assistance Administration,* Supplement D. Section 5320(1).

Subsequent to the enactment of Section 1396a(a)(23), HEW in a September 4, 1970 Departmental Memorandum addressed to all state agencies administering public assistance and medical assistance programs and signed by the Commissioner of the Medical Services Administration, implicitly informed the states that laboratories were included among those providers as to whom Medicaid recipients were accorded free choice. This interpretation was reiterated, in *Program Regulation Guide,* MSA—PRG—18, June 7, 1972, which, in dealing expressly with the subject of "free choice of providers", stated:

"State agencies are encouraged to provide each eligible individual, before the need for medical services arises, with an up-to-date referral list of all local participating vendors, particularly physicians, and pharmacists, but also including hospitals, nursing homes, *laboratories,* and other services. . . ." (at p. 3). (Emphasis added.)

Thus, an examination of official HEW issuances reveals a careful adherence to the view that the "freedom of choice" provision is fully applicable to a recipient's choice of laboratories. The relevance of this long-standing Departmental interpretation is underscored by the long line of cases holding that substantial weight must be accorded the construction given a statute by the agency charged with its administration. *Lewis v. Martin,* 397 U.S. 552, 559, 90 S.Ct. 1282, 1285, 25 L.Ed.2d 561 (1970); *Red Lion Broadcasting Co., Inc. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969); *Zemel v. Rusk,* 381 U.S. 1, 11–12, 85 S.Ct. 1271, 1278, 14 L.Ed.2d 179 (1965).

Accordingly, in light of the wording of Section 1396a(a)(23) and HEW's construction that the provision encompasses freedom of choice as to all providers of services, including laboratories, the plaintiffs and the Secretary submit that the New York City proposal would effectively end a recipient's freedom of choice in obtaining laboratory services, and therefore is contrary to federal law.

■ For the purposes of this motion for a preliminary injunction, plaintiffs' "freedom of choice" argument is sufficiently persuasive. The court has no need to deal with the other arguments advanced by the plaintiffs. Any issue concerning the standing of plaintiffs to represent patients' interest in freedom of choice was alleviated by the presence of a number of amici which more directly represent such interests and supported the plaintiffs' position. They are HEW, as previously noted, the New York State Society of Pathologists and the National Health Law Program, a patient-oriented group.

### III. *Balancing the Equities*

■■ In seeking a preliminary injunction, plaintiffs invoke the court's equity jurisdiction. Particularly in cases of preliminary injunctions, before a determination on the merits, a court must exercise its powers with great flexibility in balancing needs of the litigants. *See, e. g., Tully v. Mott Supermarkets,*

*Inc.,* 337 F.Supp. 834, 851 (D.C.N.J. 1972) ("In determining the appropriateness of the relief requested this Court has wide latitude to mold its remedy to meet the exigencies of the particular [situation]"); *J. M. Fields of Anderson, Inc. v. The Kroger Co.,* 330 F.2d 686, 687 (5th Cir. 1964) ("framing of an injunction appropriate to the facts of the case was a matter peculiarly for the discretion of the district judge sitting as chancellor"); *Rosenstiel v. Rosenstiel,* 278 F.Supp. 794, 801–02 (S.D.N.Y. 1967) (grant of injunctive relief is in "the sound discretion of the court and such court will be called on to 'balance the equities'"; it will consider "the hardship to the plaintiff . . . , the benefit to [the] plaintiff . . . , and the relative hardship to which a defendant will be subjected").

The testimony showed that a substantial number of laboratories may be forced out of business if the city's program becomes fully operative. The jobs of hundreds of professionals and paraprofessionals as well as the investments of many small private businessmen are involved. Once the structure of the small medical independent laboratory system of New York is destroyed, it may not be easily reestablished. The New York State Society of Pathologists, appearing as amicus, suggests that the city's plan may impair the ability of a patient to receive proper medical care since a single laboratory serving an entire borough with only one delivery center may result in inaccurate and delayed laboratory analysis:

> "The ability of a microbiologic laboratory to accurately and consistently evaluate or analyze such specimens would be greatly impaired in those instances where the specimens contained fragile organisms or cultures by reason of the necessary transportation of the specimens required under the City's plan. In addition, the very delay, the interruption attributable to the transportation of these specimens will also affect, from a medical point of view, the accurate analysis and diagnosis to be rendered by the pathologist in a clinical laboratory. Such tests as prothrombin tissue evaluation, partial thromboplastin examination, blood gas examination, bilirubins and sperm tests, to have any value at all, must be examined within very short periods of time."

Brief of the New York State Society of Pathologists at 3–4. Although this position was disputed at the hearing, a plan as comprehensive as the City's has never been observed in operation and, without a field test, it cannot be said that it presents no dangers to the health of many thousands of people.

If the City's plan impaired a patient's access to proper medical care, it would also raise ethical problems for doctors who are obliged to provide the best health care possible. The American Medical Association's Judicial Council has stated in a related area that,

> "Prescribing for patients involves more than the designation of drugs or devices which are most likely to prove efficacious in the treatment of a patient. The physician has an ethical responsibility to assure that high quality products will be dispensed to his patient. Obviously, the benefits of the physician's skill are diminished if the patient receives drugs or devices of inferior quality."

Opinions and Reports of the Judicial Council of the American Medical Association, section 1 at 9 (1971).

In addition, the American Medical Association has established the following tenet:

> "6. Free choice of optician, pharmacist, etc.
>
>> One of the most important principles of the [American Medical] Association has been free choice of physician; the definition of free choice is 'that degree of freedom in choosing a physician which can be exercised under usual conditions of employment between patients

and physicians.' This principle should apply to choice of optician, choice of pharmacist, etc."

Opinions and Reports of the Judicial Council of the American Medical Association, section 1 at 7 (1971). Thus a physician may have a duty to respect his patient's freedom to choose among medical services, presumably including laboratory services, as well as to ensure that a patient receives quality services. There may also be an obligation to advise the patient as to which of the available services meets standards the physician believes acceptable.

In summary, the City's plan might restrict a Medicaid patient's freedom of choice of medical services, result in possible inadequate laboratory evaluations to the detriment of patients, cause doctors serving Medicaid patients to compromise their medical ethics, and force a large number of laboratories out of business. Apart from the parties before us, we are aware that some 14% of the population of the City of New York, or over a million people, who receive Medicaid benefits will be affected by this new program of the City.

Yet, there is much to be said for the City's position. The court was most impressed with the dedicated—sometimes brilliant—City personnel, who had made extensive studies of problems in the delivery of health services before devising this program. The literature and large health delivery organizations were thoroughly canvassed. The City is properly concerned by substantial information it has gathered showing that the present system is not necessarily supplying the kinds of care needed by the poor but, rather, the more profitable services; that there may be excessive laboratory services and costs because of commercial rather than health care considerations; and that speed and accuracy might be enhanced while costs are reduced by a system of central laboratories using automated devices and computers to store and analyze data.

There is no dispute that modern medicine increasingly requires more and more complex and accurate laboratory tests; for some time the number of tests has been doubling every three to five years. Present and prospective costs are enormous. Automated testing devices when combined with computers to analyze large masses of data and individual records can be a powerful medical tool.

The court cannot ignore the fact that the cost of medical care in this country is growing at a rate warranting concern and that the poor, contrary to Congressional intent, have not generally received the same level of health care as the more affluent. It would be indefensible for the courts to prevent intelligent efforts by the responsible officials of the City of New York to meet some of these current problems. This is particularly true since the lessons learned here may serve the nation in pointing towards a more rational future health care system. *See, e. g.,* V. R. Fuchs, Who Shall Live? Health Economics and Social Choice (1974).

Moreover, the court must take judicial notice that the City is in a serious fiscal crisis. Its plan may result in substantial savings. Medicaid payments to clinical laboratories for the years 1972, 1973, and 1974 have been, respectively, $9,040,851, $8,741,251, and $10,532,694. The bids received to date by the City under its proposal (subject to investigation of facilities before the award of contracts) show that the aggregate maximum bid for all boroughs is approximately $5.1 million dollars less for each of the three years of the contract than the cost of the present system. In addition, since tests presently performed by other health facilities will be undertaken by these laboratories, there would be a further saving of $500,000 to $1,000,000 a year.

The City contends that no patient "freedom of choice" is in fact involved here since doctors traditionally make

the decision as to which laboratory will service a patient. There was evidence supporting this position.

The City urges that its program is authorized by 42 U.S.C. § 1396a(a)(30), which requires that every plan

"provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that such payments . . . are not in excess of reasonable charges consistent with efficiency, economy, and quality of care."

The City also states that its centralized laboratories plan will in fact improve patient care since the new facilities will be able to use technical advances enabling testing of more specimens at one time than do present smaller laboratories. It states that centralized laboratories will also be able to provide a prompt report to the attending physician and a means of storing all records of a single patient in computers for simple retrieval, thus reducing duplication and over-utilization.

The equities in this case are obviously divided. The shape of the court's injunctive relief must reflect that balance. The court's ability to act decisively is severely hampered because none of the parties has been able to satisfactorily demonstrate what will in fact occur if the City's program is put into operation. It is not clear how well the program will work and what its effect will be on the health of Medicaid patients, on doctors, on laboratories and on the City. Accordingly, the court's preliminary injunction will permit the City to proceed with its program in only one of the City's five boroughs.

The court is persuaded that it would be appropriate to follow a suggestion of the Secretary of HEW to try the program in a limited locality. HEW suggested a statutorily-authorized "experimental" project. Pursuant to 42 U.S.C. § 1315 the Secretary of HEW is author-ized to waive compliance with any provision of the Medicaid statutes, including the "freedom of choice" provision (42 U.S.C. § 1396a(a)(23)), to the extent and for the period he finds necessary to enable a state to carry out an "experimental, pilot, or demonstration project" which in his judgment is likely to assist in promoting the objectives of the Medicaid program. The constitutionality of this provision and the specific application which the Secretary has made of it have been upheld in the two cases in which waivers granted by the Secretary have been challenged. *See Aguayo v. Richardson*, 352 F.Supp. 462 (S.D.N.Y.), *modified on other grounds*, 473 F.2d 1090, *stay denied*, 410 U.S. 921, 93 S.Ct. 1350, 35 L.Ed.2d 583 (2d Cir.), *cert. denied*, 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 101 (1972); *California Welfare Rights Organization v. Richardson*, 348 F.Supp. 491 (N.D.Cal.1972).

It is important to note that this court is not approving an experiment on Medicaid recipients in any part of the City. Such recipients would be subject to the program if the court did not intervene. The court is merely enjoining operation of the program in certain areas of the City, allowing the City to proceed with its plans in one area if it wishes to do so. There is no need, therefore, to consider ethical issues of experiments on people.

If the City's program is limited in scope to one borough it could be sufficiently reduced in its possible detrimental impact to permit the City to proceed. Permitting operation on the limited scale of a single borough may assist the parties, HEW, and the court in making final determinations on the merits.

While the decision is, of necessity, somewhat arbitrary, the court concludes that Queens should be the borough exempted from the injunctive relief granted to the plaintiffs. Queens is within the Eastern District. It has a comparatively small Medicaid population so that the possible detrimental impact of the

City's program can be limited and guarded against. Yet, it is not so small that the experience will not have a bearing in considering application to other boroughs. If, however, the City has good reason to choose another borough, it should so indicate to the court at the time a proposed order is submitted.

IV. *Observation and Hearings by HEW*

This court is, of course, limited in its ability to effectively oversee the implementation of the City's program even in one borough. Unlike the court, HEW has expertise and experience in evaluating the workability of Medicaid programs. The court requests the assistance of HEW in evaluating the effect and impact of the implementation of the City's exclusive contract program in one borough of New York. *Cf.*, W. Gelhorn and C. Byse, Administrative Law 254–256 (1970 ed.) (primary jurisdiction doctrine). Under 42 U.S.C. § 1396c, the Secretary is empowered to hold hearings and make findings concerning a plan's compliance with Medicaid's statutory standards after that plan has been implemented. Thus, if a limited-scope program is established on the "experimental" scale envisioned in 42 U.S.C. § 1315, HEW could, pursuant to 42 U.S.C. § 1396c, undertake an administrative review of the efficacy of such a program under the statutory "freedom of choice" standards of 42 U.S.C. § 1396a(a)(23).

V. *Conclusion*

The plaintiffs, having shown a threat of irreparable injury and a substantial probability of success on the merits, are entitled to preliminary injunctive relief. Since the impact of the City's exclusive-contract plan is unclear, the court, in balancing the equities, finds that the City is entitled to effectuate its program in one borough of the City.

At further hearings before this court, based on experience and other evidence, and information obtained by HEW, the court will address itself to such problems as:

1) whether the program's possible limitations on patients' ability to choose laboratory services has a detrimental impact on the quality of health services available to such patients;

2) whether such detrimental impact is legally significant;

3) whether the statutory "freedom of choice" requirement is applicable to laboratory services; and

4) whether a doctor's ethical obligation to ensure quality laboratory services for his patients is in fact impaired by the program.

The parties will submit proposed orders based on this opinion on notice within ten days. They shall consult in an attempt to agree on terms of an order. Such agreement shall not be deemed to be a waiver of any objection to this court's findings or to the order.

So ordered.