Christina CHISHOLM, et al.

v.

David HOOD, Secretary, Louisiana Department of Health & Hospitals

No. Civ.A.97–3274.

United States District Court, E.D. Louisiana.

Aug. 21, 2000.

Sarah Hall Voigt, New Orleans, LA, Ellen Bentley Hahn, Advocacy Center for the Elderly & Disabled, Lafayette, LA, David Holman Williams, Peller . & Williams, New Orleans, LA, Jane Perkins, National Health Law Program, Chapel Hill, NC, for Melanie Chisholm, Linda Ellison, Willie Mae Reams.

Lou Ann Owen, Louisiana Dept. of Health and Hospitals, Bureau of Legal Services, Baton Rouge, LA, Charles E. Daspit, Louisiana Dept. of Health and Hospitals, Baton Rouge, LA, Stephen Robert Russo, Dept. of Health and Hospitals, Baton Rouge, LA, for David W. Hood.

## ORDER AND REASONS

BARBIER, District Judge.

Before the Court are cross **Motions for Partial Summary Judgment** filed by plaintiffs (Rec.Doc. 50) and defendant (Rec.Doc. 56) which were heard with oral argument on July 19, 2000. Both motions are opposed.

In this case, plaintiff and other similarly situated individuals take issue with Louisiana's policy regarding the provision of medically necessary services to disabled children. They argue, *inter alia*, that Louisiana's policy of limiting Medicaid eligible disabled children to occupational, speech, and audiological services provided by their resident school board violates the provisions of the Medicaid Act requiring that participants have a *choice* of providers for these services. Additionally, Christina Chisholm, who is essentially homebound due to profound medical disabilities, argues that the requirement that she (and other similarly situated homebound children) receive these services through their resident school board does not only limit her choice of providers, but completely denies access to needed services which the state is required to provide by federal law.

Finding that plaintiffs' above arguments have merit, the Court **GRANTS IN PART** plaintiffs' motion, and DENIES defendant's motion, for the following reasons.

## I. BACKGROUND

### A. FACTS AND PROCEDURAL HISTORY

In October of 1997, plaintiffs filed suit against defendant Louisiana Department of Health and Hospitals ("DHH"), alleging numerous Medicaid violations. Plaintiffs have been certified as a class of "all current and future recipients of Medicaid under the age of twenty-one who are now and will in the future be placed in the Mental Retardation/Developmental Disabilities ("MR/DD") Waiver waiting list." *Chisholm v. Jindal*, 1998 WL 92272

(E.D.La. March 2, 1998) (Duval, J). While not technically divided into sub-classes, the class includes two groups: children who attend school and are required by the state to receive needed services through their school; and children who are essentially homebound due to profound medical disabilities, but are unable to receive medically necessary services at home.

Since filing suit, the parties have entered into a partial settlement which resolved some of plaintiffs' claims. The Court conducted a fairness hearing and approved the settlement on February 16, 2000. The central provision of the settlement requires DHH to implement a system of case management services for class members. Case management services are available to every person who is a class member.[1] Case management services are intended to assist recipients in gaining access to the full range of needed services including medical, social, and educational services. The settlement also provides for certain informing and training requirements.

## B. LOUISIANA'S MEDICAID SYSTEM

### 1. THE PLAYERS AND PROGRAMS

When this litigation commenced, DHH had over 3,600 Medicaid recipients under 21 on a four-year waiting list to receive special services for mental retardation or related developmental disabilities ("MR/DD"). Class members are wait-listed for these services under the state's "MR/DD waiver," which provides comprehensive medical and social services to allow them to be cared for in the community, instead of being institutionalized. Unlike other areas of Louisiana's Medicaid program, the MR/DD waiver serves only a specified number of persons at one time.

Defendant DHH is the single state agency charged with administering the Medicaid program in Louisiana. Under a contract with DHH, Unisys operates as the State's fiscal intermediary, acting on requests for services that must be pre-approved in order for Medicaid to pay them, and processing claims for payment after services have been rendered. DHH does not, however, have contracts with Medicaid service providers except for case management providers. Any medical service provider may ·seek payment from Medicaid so long as they are "qualified."

Since 1991, Birch and Davis Health Management Corporation ("Birch and Davis") has been responsible, under a contract with DHH, for carrying out certain aspects of Louisiana's obligation to provide Early and Periodic Screening, Diagnostic, and Treatment services ("EPSDT") to all persons under twenty-one years of age. The purpose of EPSDT services is to ascertain physical and mental defects and to correct or ameliorate any defects or chronic conditions. Under EPSDT, individuals receive screening, vision, dental, and hearing services. The screening services include comprehensive health, physical and mental, developmental history, a comprehensive physical exam, appropriate immunizations, laboratory tests, and health education for both the individuals and the parents. EPSDT services for individuals under the age of twenty-one are required by federal law. Once states choose to cover optional services under the Medicaid plan, states are then required to cover any of the optional services under EPSDT if deemed medically necessary.

Under a program known as KIDMED, Birch and Davis enrolls and certifies EPSDT screening providers; trains providers in screening procedures; performs outreach to eligible children and their families; schedules and tracks medical ap-

---

1. Case management is even available for class members who, although on the MR/DD waiting list, are determined ineligible for the MR/DD waiver because the member did not undergo a Diagnostic and Evaluation. Ultimately, the case management system is voluntary.

pointments; designs advertising and public relations initiatives; and administers a system of managed care in 20 of Louisiana's parishes.

Aside from administering Louisiana's Medicaid program, DHH administers a number of other health programs. Some of these programs are under the Office for Citizens with Developmental Disabilities ("OCDD") which, under certain circumstances, provides support and services to individuals with developmental disabilities. These services include personal care services ("PCS"), case management services, speech therapy, occupational therapy, and physical therapy. OCDD's services are paid for exclusively with state funds.

However, different services are provided under certain programs. One of the more relevant and important distinctions arises between what services are offered under the MR/DD waiver program and what services are offered under EPSDT. Under the MR/DD waiver program, personal care attendant ("PCA") services are provided. PCA services are considered skilled services which may be performed only by a health care professional and are available for a limited number of individuals. The EPSDT program does not encompass PCA services but only PCS services related to a patient's physical requirements—such as assistance with eating, bathing, dressing, personal hygiene, activities of daily living, bladder and bowel requirements, and taking medications.[2] EPSDT PCS services, however, are not limited to a set number of eligible recipients. Because of the wide range of services under PCS and the attendant services necessary to perform PCA services, PCA and PCS services include a large overlapping of unskilled physical assistance. Confusion exists among Medicaid providers as to which services can be provided under PCS and which services must instead be provided under other Medicaid services. Indeed,

many providers perform both PCA and PCS services.

Furthermore, DHH does not provide occupational, speech, or language therapy services to class members through its home health benefit. Before the age of three, early intervention centers ("EIC") provide occupational, speech, and language services at home, if medically necessary. Once EPSDT recipients reach the age of three, class members can only receive these services through the resident school board. School boards are not required to provide all services needed to correct or ameliorate children's disabilities, just those that will assist with their educational objectives. Class members will then only receive these services at home, if that particular school board permits it. DHH reimburses the schools for these services even though they are provided pursuant to the Individuals with Disabilities Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* The Department of Education provides the state matching funds for these services.

In order for the school board or an early intervention center to be reimbursed, the services must appear on a child's individualized family service plan ("IFSP") for those up to three years of age and the individualized education plan ("IEP") for those ages three to 21. For those services on a child's IFSP, Medicaid will reimburse the services for the federal match and the Department of Education is required to assure payment of the state match. For those children with an IEP, the individual school boards are required to certify the match. DHH makes covered Medicaid services available to children over and beyond what is in the child's IFSP or IEP. If the child meets the eligibility and program requirements, then the covered service is available. For example, if physical therapy were listed in a child's IEP, but the child also needed more services "over and beyond" what was contained in the IEP,

---

**2.** Under certain circumstances, a different Medicaid service, extended home health care, can provide assistance for the skilled "medi-

cal tasks" included under PCA services by qualified home health care professionals.

the child would be able to receive physical therapy services in a setting other than a school, if otherwise eligible. For services above and beyond those contained in the IEP or IFSP, class members may receive services from any Medicaid enrolled provider.

## 2. THE PROCEDURE

DHH requires that many special services be "prior authorized" before Medicaid will provide reimbursement. Examples include home health services if more than one visit per day is requested, PCS services, medical equipment for use in the home, and rehabilitation services (occupational therapy, physical therapy, as well as speech, language, and hearing therapy provided in rehabilitation centers). Recipients needing prior approval services must go through a three-step process. First, the recipient must obtain a prescription from her physician, ordering or prescribing a particular service. In many cases, the physician's documentation must also include other diagnostic or functional information justifying the appropriateness of the service. Second, the request is submitted to the medical provider which will provide the service. Third, the medical provider submits the request for review to Unisys' Prior Authorization Unit, which determines whether the prior authorization request is medically necessary and, therefore, whether the request will be approved.[3]

For each submitted request, a contractor reviews the request and issues a decision approving, denying, or approving in part. The notice is then issued to both the recipient and the provider, giving a numbered denial code, with a few words below

explaining the decision. The notice includes a description of the recipient's appeal rights.

To obtain EPSDT services under this procedure, recipients must find a medical provider who accepts Medicaid and will provide the service. Private providers are not required to submit to Unisys or to any state agency either all or part of the recipient's requested services. DHH has not established a system or adopted a policy to track incomplete or absent requests. No notice is required for recipients whose request is not submitted in full or at all.

Once prior approval requests are submitted, Unisys reviews only the recipient's eligibility for the specific services submitted by the provider. In many instances, the requested service is denied because some alternative service or supply would meet the need; however, the alternative is not listed. In addition, Unisys' reviewers look at PCS requests as requests solely for PCS. If portions of the requested services are not approved as PCS, Unisys does not issue an approval for the services, even if the services would clearly be covered under an alternative Medicaid service. Even for requests made under the appropriate service, Unisys often does not reach a determination of whether the service is needed due to inadequate paperwork. Approximately 75% of all denials are due to insufficient documentation. It may take providers several attempts before they submit adequate documentation.[4]

## II. DISCUSSION

In these motions, plaintiffs and DHH have limited the scope of the present motions to three issues:[5]

---

3. Occasionally, DHH is consulted and makes the ultimate determination about medical necessity or utilization control.

4. This is part of the problem which class members face -there is no incentive or requirement for private providers to do the "paperwork" necessary to successfully navigate through the prior approval system.

5. In their motion for summary judgment, plaintiffs initially presented seven issues for the Court to consider. However, in the reply memorandum, plaintiffs withdrew certain issues, leaving only these three issues to be resolved.

1. Whether DHH violates Medicaid treatment obligations by limiting providers of occupational, speech, and audiological services to school boards;

2. Whether DHH violates Medicaid EPSDT provisions by failing to insure that treatment is provided to class members as a result of EPSDT screens; and

3. Whether Louisiana Medicaid's prior approval system violates the EPSDT provisions by refusing requests for EPSDT services without ruling on the medical necessity of requested services, without arranging needed treatment, and without giving notice of appeal rights regarding services not provided.

However, before engaging in an analysis of these issues, it is important to note the terms of the parties' partial settlement and the issues previously resolved.

## A. SETTLED ISSUES

There has been one perfected partial settlement between the parties, and the parties have agreed to certain language for a second partial settlement. These two settlements dispose of five matters which affect the issues before the Court. The first and most important issue is case management. Case management services assist Medicaid-eligible individuals in gaining access to needed medical, social, educational, and other services. DHH has implemented case management services for members of the class which are designed to assist in locating, coordinating, and monitoring care for children with disabilities. Case managers are required to (1) collect information on the health needs of the child, make and follow-up on referrals as needed, maintain health history, and activate the examination/diagnosis/treatment "loop"; (2) perform a case management assessment in the recipient's home; (3) develop a written comprehensive plan of care based upon assessment data, observation, and other sources of information, identifying the services required by the recipient and the resources available to meet those needs; (4) arrange for services agreed upon with the recipient and identified in the plan of care, and follow-up with the family to monitor the provision of services; (5) visit the recipient's home at least quarterly; and (6) make a complete review of the plan of care for each recipient at least every six months to assure that goals and services are appropriate and to determine whether a change necessitates a revision of the plan of care.

The second issue disposed of by the settlement is whether Louisiana is currently wait-listing class members for EPSDT services. DHH is no longer wait-listing class members for medical assistance. Case managers are to ensure that the members' needs are addressed on a regular basis.

The third issue which the settlement addressed concerned interperiodic screens. The settlement incorporated plaintiffs' desired language and remedy which provides:

The KIDMED contractor will be required to contact class members who are linked to a KIDMED provider and who have been screened according to their periodicity schedule for whom a tear off has been received. The KIDMED contractor will attempt to reach the recipient two times by telephone. If these attempts are unsuccessful, a letter will be sent.

The contractor will be made to determine why the tear was sent in. If the parent/guardian desires a screen, it will be provided.

The KIDMED contractor will draft and implement a protocol and script for handling requests for interperiodic screens that come from third parties such as educational professionals, case managers, and health professionals. This protocol will be developed in consensus with plaintiffs' counsel and will include questions about the person and/or condition

for which the call is made. The KID-MED contractor will make referrals for such interperiodic screens and schedule and track the appointment.

The fourth issue which the second, yet to be perfected, partial settlement focuses upon concerns the location of the PCS providers in Louisiana. The unavailability of either PCS or extended home health services is not before the Court. Plaintiffs have not alleged that those services are not made available by the defendant. Furthermore, the parties have agreed to certain settlement language with respect to these two services which provides for DHH to obtain a provider within 10 working days and notify the case managers.

The final issue covered by the second partial settlement pertains to informing the class members. The parties have agreed as part of the prior authorization informing issue that the defendant will provide notice of denials for less costly alternative services to give appropriate notice that the less costly services are available. Consequently, all of the plaintiffs' allegations concerning informing have been settled except with regard to those services needing the state agency's prior approval and with regard to plaintiffs' allegations regarding private providers.

## B. CROSS MOTIONS FOR SUMMARY JUDGMENT

For the following reasons, the Court finds that DHH is in violation of federal law by its restriction of occupational, speech, and audiological therapies exclusively to school boards. The Court defers ruling on the issues of DHH's screening procedures and DHH's ability to adequately arrange treatment for the class members, finding that the partial settlement between the parties may well resolve these two issues and that fairness and comity require an opportunity for the settlement to work.

**1. Whether DHH violates Medicaid treatment obligations by limiting providers of occupational, speech, and audiological services to school boards.**

Because Louisiana accepts federal funding for its Medicaid program, it obligates itself to comply with federal Medicaid law. *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 502, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). Louisiana accepts over two billion dollars a year in federal funding for its Medicaid program. State Medicaid agencies have a baseline obligation to set up an adequate system of services and inform recipients about the available services. The services provided must include at least hospital, outpatient, laboratory, X-ray, nursing home, family planning, physician, and home health services. 42 U.S.C. § 1396a(a)(10)(A) & (D). Services provided must be available to the same extent as for other individuals in the same geographic area with private or public insurance coverage. State Medicaid agencies must also inform applicants about available services both in writing and orally. 42 C.F.R. § 435.905(a)(2).

Additional standards apply to recipients under the age of twenty-one. States are required to provide them with EPSDT services. 42 U.S.C. § 1396a(a)(10)(A). EPSDT treatment includes all services set out in the Medicaid Act's definition of medical assistance, 42 U.S.C. § 1396d(a), as well as optional services the state has opted not to provide in other circumstances, 42 U.S.C. § 1396d(r)(5). Therefore, states must provide all services to EPSDT recipients, if within the definition of medical assistance. In providing these EPSDT services, states are further obligated to actively arrange for corrective treatment, the need for which is disclosed by screening, either directly or through referral to appropriate agencies, organizations, or individuals. 42 U.S.C. § 1396a(a)(43)(C).

In furtherance of these obligations, state agencies "must make available *a variety* of individual and group providers qualified

and willing to provide EPSDT services." 42 C.F.R. § 441.61(b) (emphasis supplied). Exactly how and in what fashion the state provides these services is left up to the state, as long as the state's plan to provide EPSDT services "complies satisfactorily" with the requirements of federal law. *Mitchell v. Johnston,* 701 F.2d 337, 343 (5th Cir.1983).

The Court finds that DHH has not complied satisfactorily with the federal mandate to provide a "variety" of qualified and willing providers by limiting occupational, speech, and audiological services exclusively to those allowed by school boards.[6] The Court finds that DHH's practices violate federal law on two separate grounds: the first affecting only homebound class members; and the second affecting all class members.

■ First, DHH's practice clearly violates the federal requirement that state agencies make available providers for medically necessary services. It is undisputed in this case that the services requested are medically necessary. By strictly limiting these services to schools and prohibiting inclusion of such services under home health services, DHH is not providing or making available these medically necessary services to those class members who are confined to the home. Plaintiffs have submitted uncontroverted evidence that class representative Christina Chisholm requires these services and that, because of her profound disabilities, she is confined to the home, thereby conclusively establishing that DHH's policy effectively precludes Chisholm and other similarly situated class members from receiving these services. A policy which completely prevents eligible recipients from receiving these medically necessary services can

hardly be considered as complying with the federal mandate.

■ Second, DHH's limitations on these services violate class members' federally mandated right to choose from a "variety" of providers, allowing them to get services from "any institution, agency, community, pharmacy, or person, qualified" to provide them who undertakes to do so.[7] 42 U.S.C. § 1396a(a)(23)(A); *see also* 42 C.F.R. § 441.61(b). In a letter dated February 1, 1994, the Health Care Financing Administration informed DHH that Louisiana "may not require Medicaid eligible students to receive health related services through the school (in the absence of a federal freedom of choice waiver). Medicaid recipients must be permitted to obtain services outside the school-based services system if they wish. In addition, States must allow all qualified providers to participate in Medicaid." Restricting Medicaid recipients to schools and EICs for therapy services that are traditionally included in their educational or family service plans violates their statutory right to obtain these services from other qualified providers. *See RX Pharmacies Plus, Inc. v. Weil,* 883 F.Supp. 549, 555 (D.Colo.1995) ("[M]edicaid recipients must be accorded freedom to choose medical providers...."); *Bay Ridge Diagnostic Lab., Inc. v. Dumpson,* 400 F.Supp. 1104, 1108 (E.D.N.Y.1975) (granting a preliminary injunction against the State due in part to restrictions in medical services created by the State's limiting of laboratory services to those which have a contract with the state); *see generally O'Bannon v. Town Court Nursing Center,* 447 U.S. 773, 785, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980) ("[Section] 1396a(a)(23) gives recipients

**6.** For class members under the age of three, these services are limited to EICs.

**7.** The Court notes that it is possible for class members to utilize other types of providers, such as rehabilitation centers and outpatient clinics, for services over and above those called for in an IEP or IFSP. However, the Court finds that this neither presents a choice

nor a safety value, as class members are either routinely denied home health services by Unisys, which instructs class members that these service are only available through the school system, or home health agencies are not permitted to provide occupational, speech, and audiological services.

the right to choose among a range of qualified providers, without government interference."). A final important consideration is that schools are not under the EPSDT mandate to provide all services needed to correct or ameliorate children's health conditions. Rather, the schools' mandate is to provide services that will benefit children's schooling and has additionally been interpreted as applying only to services during school hours. *Cedar Rapids Community Sch. Dist. v. Garret*, 526 U.S. 66, 72–75, 119 S.Ct. 992, 143 L.Ed.2d 154 (1999).

■ In its motion, DHH argues that states have the discretion and the option to provide in a reasonable manner the necessary services. By providing these services through schools, DHH maintains, it has merely elected to craft a plan, reasonable under the federal mandate, which as an agency decision should be accorded deference.[8] Furthermore, it asserts, audiological services, occupational, speech, and audiological therapies are health related *education* services and properly addressed in a school setting. It is only for those services traditionally rendered by a school that DHH limits the provider which may provide those services. Because it is the school that is responsible for these services, DHH suggests it is merely a funding mechanism, not for the child but for the school, since the school is responsible for any services in a child's IEP or IFSP.

DHH's arguments are not persuasive and ignore the federal mandate that these services are medically necessary; as medically necessary services they are mandatory; and because they are mandatory the

State is obligated to provide class members with a variety, or choice, of providers. DHH cannot excuse its policy which completely precludes homebound class members from obtaining necessary medical treatment or pawn off its obligation to the class as a whole by delegating it to a State agency not under the same federal mandate.

Consequently, the federal Medicaid mandate requires that DHH be enjoined from enforcing restrictions on the providers of EPSDT Health Services and required to affirmatively notify class members, through school providers, that class members can choose whether to get services from the school system or other qualified providers.

**2. Whether DHH violates Medicaid EPSDT provisions by failing to insure that treatment is provided to class members as a result of EPSDT screens.**

As noted above, Section 1396d(r)(5) requires Medicaid participating states to provide necessary treatment "to correct or ameliorate defects and physical ... illnesses and conditions discovered by the screening services, whether or not such services are covered under a state plan." In providing these EPSDT services, states are further obligated to actively arrange for corrective treatment, disclosed by screening services, either directly or through referral to appropriate agencies, organizations, or individuals. 42 U.S.C. § 1396a(a)(43)(C).

---

8. DHH argues that the decision to limit occupational, speech, and audiological services to schools is an agency decision which must be given deference by a reviewing court, unless the agency's interpretation is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). However, *Chevron* deference applies to formal federal agency decisions and regulations interpreting ambiguous statutes. It does not apply to situations, like this one, in which a

state agency has made a decision interpreting an unambiguous federal statute. *Christensen v. Harris County*, 529 U.S. 576, 120 S.Ct. 1655, 1662–63, 146 L.Ed.2d 621 (2000). Further, while *Christensen* acknowledges that opinion letters of federal agencies interpreting the statutes those agencies are charged with administering often have value as persuasive authority, in this case, the federal Health Care Financing Administration's letter of February 1, 1994 found Louisiana's policy directly at odds with the Medicaid statute's requirements.

EPSDT screens are an integral part of EPSDT, and federal statutes include within the definition of EPSDT screens, not just a regularly scheduled checkup screen, 42 U.S.C § 1396d(r)(1)(A)(i), but also screens intended to "determine the existence of certain physical or mental illnesses or conditions," 42 U.S.C. § 1396d(r)(1)(A)(ii). The purpose for the screens is "to ensure that any illness, defect, or medical condition that is present would be detected and treated early." 58 Fed.Reg. 51288, 51290–91 (Oct. 1, 1993).

Plaintiffs argue that federal law mandates that DHH insure that treatment is provided to class members once EPSDT screening has indicated that treatment is needed. DHH, plaintiffs maintain, does nothing to make sure that treatment is actually provided. Essentially, plaintiffs want some sort of mechanism created which would make certain that, after screening has demonstrated that the individual has a medical problem, someone follows up with the individual to certify that the individual receives the necessary treatment. Under the present scheme, DHH does not track whether treatment is provided when (1) the screening doctor supposedly undertakes treatment herself, or (2) the screening doctor refers the class member to another practitioner for treatment. As evidence of the failure of the current system, plaintiffs point to a low utilization rate of EPSDT services, noting that remarkably few class members ever seek or receive necessary treatment after screening.[9]

On the other hand, DHH argues that it has satisfied its obligation to arrange treatment for class members by putting a case management system in place as a result of the partial settlement, by enrolling providers, and by implementing a prior authorization system.

The Court finds, at this time, that the February 2000 partial settlement deserves an opportunity to work. The case management system which resulted from the partial settlement should, at least *in theory*, assuage any fear that a class member will not follow through with treatment after screening has uncovered a medical problem. As previously noted, case managers are required to (1) collect information on the Health needs of the child, make and follow-up on referrals as needed, maintain health history, and activate the examination/diagnosis/treatment "loop"; (2) perform a case management assessment in the recipient's home; (3) develop a written comprehensive plan of care based upon assessment data, observation, and other sources of information, identifying the services required by the recipient and the resources available to meet those needs; (4) arrange for services agreed upon with the recipient and identified in the plan of care, and follow-up with the family to monitor the provision of services; (5) visit the recipient's home at least quarterly; and (6) make a complete review of the plan of care for each recipient at least every six months, to assure that goals and services are appropriate, and whether a change necessitates a revision of the plan of care.

These services should ensure that treatment is actually received. In particular, case managers are required to meet with class members quarterly and develop comprehensive plans. It appears unlikely that during the course of such a visit that a case manager would not know whether treatment was in fact received. Indeed, plaintiffs themselves state that the sought after relief is "some sort of monitoring of the class members." Case managers should provide that type of monitoring. However, the Court declines to grant DHH's motion on this issue because active case management has only begun to be phased in since February 2000, and it remains somewhat speculative at this time as to whether this new system will work as

---

9. Specifically, plaintiffs cite data which show that only 109 out of 3381 class members received PCS services, reflecting only a 3% utilization rate.

intended.[10] Instead, the Court denies the cross-motions on this issue and will allow the parties an opportunity, if necessary, to raise this issue again in the future.

3. **Whether Louisiana Medicaid's prior approval system violates the EPSDT provisions by refusing requests for EPSDT services without ruling on the medical necessity of requested services, without arranging needed treatment, and without giving notice of appeal rights regarding services not provided.**

This issue can be restated as whether DHH's policy of prior approval as it currently is structured, by allowing providers to refuse some applicant's requests without arranging for alternative treatment and without providing the applicant with notice of her appeal rights, "complies satisfactorily" with the requirements of federal law. It is important to note that the parties do *not* dispute that DHH is allowed to implement a prior approval system and that Medicaid programs can require that requests for prior approval are submitted through private medical providers.

Plaintiffs allege that the prior approval system is so rife with problems that, as it now stands, it effectively precludes class members from federally mandated access to treatment. Plaintiffs cite these problems: (1) allowing the private providers submitting the requests (who are not paid for doing so) to refuse to submit requests and to submit far fewer services that the recipient requested, without notifying the recipient of her EPSDT rights; (2) denying claims for procedural reasons without following up to arrange appropriate services, including procedural reasons created by DHH having split up its EPSDT responsibilities among diverse private providers; (3) not notifying those denied of the right to all medically necessary medical assistance; and (4) dividing up the services provided for MR/DD waiver recipients competing among private providers, whom DHH will not permit to simultaneously help the recipient.

As relief, plaintiffs request that DHH be ordered to: (1) notify EPSDT recipients of their right to all medically necessary services and appeal rights, both when there are formal denials and when providers refuse to submit some or all of a recipient's requests for Medicaid review; (2) develop all requests from EPSDT recipients that get submitted to the prior approval unit, to the point of an appealable determination as to the medical necessity of the services; and (3) report to the court as to how DHH would facilitate arranging the full set of services encompassed within PCA for class members.

In its motion, DHH asserts that the case management services provided as a result of the first settlement between the parties may solve many of the problems in "arranging" services; that DHH has made services "available" and that is enough to fulfill its responsibilities; and once DHH has delegated its EPSDT responsibilities to private actors, there is no state action or control over what they do.[11]

---

10. The Court notes plaintiffs' valid concern that class members are failing to respond in large numbers to the available case management services. According to reports provided by defendant under the settlement, 1397 offers of case management services were issued from February through April, and by the end of April, only 199 class members had responded seeking case managers. The Court agrees that the problems inherent in the current system will not be adequately addressed unless there is an intensive and broad-based educational effort to make the new case manager system work.

11. DHH's argument that there is no state action because it is the private medical providers which engage in any unconstitutional conduct is misguided. Plaintiffs' claims are for violation of federal statutes, not constitutional due process or 42 U.S.C. § 1983 violations. Although plaintiffs listed these alternative theories in their Complaint, at oral argument on these motions counsel for plaintiffs stated that only statutory claims were being pursued.

The Court finds that the February 2000 settlement may well cure many of these problems, pretermits DHH's other arguments, and denies the cross motions as to this issue. This issue evidences a genuine and pragmatic concern that Louisiana's most severely mentally retarded and developmentally disabled children are not receiving medically necessary care as mandated by federal law. Again, the case management system which is presently being implemented should alleviate many of these current problems. Case managers should *in theory:* (1) submit all requests for treatment; (2) inform applicants of their appellate rights; (3) organize an applicant's file and steer the applicant through the system, minimizing any denial of claims based upon insufficient documentation; and (4) notify applicants of their right to medically necessary treatment. Although plaintiffs cite to numerous legitimate concerns, it's difficult to gauge how many, if any, of these concerns will be mooted by an effective implementation of the case management system. Difficulty in securing services and of knowing rights are problems which good case management service should remedy. However, the present case management solution may yet turn out to be problematic because it is still not fully implemented. Consequently, the Court denies the motions as to this issue and will allow the parties to revisit this issue in the future, if needed.

### C. CONCLUSION

In sum, the Court finds that (1) DHH has violated federal Medicaid law by limiting occupational, speech, and audiological services to schools; and (2) that the remaining issues should be deferred at this time to allow the terms of the February 2000 settlement agreement, especially the implementation of a case-management system, an opportunity to work. Accordingly,

**IT IS ORDERED** that plaintiffs' Motion for Summary Judgment (Rec.Doc. 50) should be and is hereby **GRANTED IN PART** and that DHH's Motion for Summary Judgment (Rec.Doc. 56) should be and is hereby **DENIED.**

**IT IS FURTHER ORDERED** that the Louisiana Department of Health and Hospitals should be and is hereby permanently **ENJOINED** from enforcing restrictions on the providers of EPSDT Health Services and should be and is hereby **ORDERED** to affirmatively notify class members, through school providers, that class members can choose whether to get services from the school system or another qualified provider. The parties are to submit a joint proposed form for a Final Judgment, pursuant to F.R.Civ.P., Rule 54(b), in accordance with the Court's rulings.