JOHN B., Carrie G., Joshua M., Meagan A. and Erica A. by their next friend, L.A.; Dustin P. by his next friend, Linda C.; Bayli S. by her next friend, C.W.; James D. by his next friend, Susan H.; Elsie H. by her next friend, Stacy Miller; Julian C. by his next friend, Shawn C.; Troy D. by his next friend, T.W.; RAY M. by his next friend, P.D.; Roscoe W. by his next friend, B.W.; William B by his next friend, K.B.; Jacob R. by his next friend, Kim R.; Justin S. by his next friend, Diane P.; Estel W. by his next friend, E.D.; individually and on behalf of all others similarly situated, Plaintiffs,

v.

Nancy MENKE, Commissioner, Tennessee Department of Health; Theresa Clarke, Assistant Commissioner Bureau of TennCare; George Hattaway, Commissioner Tennessee Department of Children's Services, Defendants.

No. 3:98–0168.

United States District Court,
M.D. Tennessee,
Nashville Division.

Dec. 19, 2001.

Gordon Bonnyman, Michele M. Johnson, Patricia George, Gary D. Housepian, David Kozlowski, Hugh Mundy, Russel J. Overby, Tennessee Justice Center, Nashville, TN, for plaintiffs.

Paul G. Summers, Atty Gen. and Reports, Linda A. Ross, Deputy Atty. Gen., Katherine Brown, Assist. Atty. Gen., Nashville, TN, Kathryn Stephenson, Leesa A. Hinson, Paul W. Ambrosius, Doramus, Trauger & Ney, Nashville, TN, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN T. NIXON, Senior District Judge.

### Part One. Plaintiffs' Motion to Show Cause

This civil action involves the State of Tennessee's provision of health benefits pursuant to the federal Early Periodic Screening, Diagnosis and Treatment (EPSDT) requirement. After the Plaintiffs filed their complaint on February 25, 1998 (Doc. No. 1), the parties immediately filed a Consent Decree, governing Tennessee's duties under EPSDT. (Doc. No. 12).

### Background

In 1994, the State converted its Medicaid-based fee-for-service health plan to a managed care system called TennCare.[1]

Until 1994, the State participated in the traditional Medicaid program. However, in 1993 Tennessee sought and obtained from the United States Secretary of Health and Human Services a five-year waiver, effective January 1, 1994, under Section 1115 of the Social Security Act, 42 U.S.C. § 1315[2] (waiver). The original waiver, by suspending certain federal statutory and regulatory provisions, allowed the State to replace its Medicaid program with TennCare.[3]

TennCare differs from traditional Medicaid in two pertinent ways. First, TennCare converted Tennessee's Medicaid program from a fee-for-service system to a managed care system, whereby recipients obtain services from a limited number of network providers known as Managed Care Organizations (MCOs). The MCO is paid a monthly capitated rate for each beneficiary, based on eligibility characteristics of the enrollee. In return, the MCO is required to provide the beneficiary all medically necessary health care services covered by the TennCare scope of benefits, as provided in the TennCare waiver. The MCOs then assign their enrollees to primary care providers (PCPs). The PCPs manage the individual beneficiaries' access to specialists or other medical care. The MCOs are required to spend eighty-five percent of their capitation revenue for medical services. Any shortfall must be absorbed by the MCO as a loss, subject to risk sharing agreements[4] with the State, while any excess after administrative costs

1. For background on Medicaid managed care, with an emphasis on TennCare, *see* James F. Blumstein and Frank A. Sloan, *Health Care Reform Through Medicaid Managed Care: Tennessee (TennCare) as a Case Study and a Paradigm,* 53 Vand. L.Rev. 125 (2000).

2. The State has received a three-year extension of the waiver, pursuant to 42 U.S.C. § 1396n.

3. For a general discussion of section 1115 waivers, *see* Judith M. Rosenberg and David T. Zaring, *Managing Medicaid Waivers: Section 1115,* 32 Harv. J. on Legis. 545 (1995).

4. Under the current risk arrangement, approximately 784,000 enrollees are in plans where the State is at risk. Approximately 460,000 enrollees are in plans where the State has shared risk. Of the approximately 1,429,000 total enrollees, about 655,000 are

is considered profit. The scope of the benefits covered by the risk agreement is limited by various "carve outs" that are solely the responsibility of the MCO.[5]

Approximately 9½ percent of children in the plaintiffs' class are enrolled in Tenn-Care Select, the State's self-insured Tenn-Care MCO. TennCare Select provides services to populations that, for varying geographic and health care reasons, are more difficult to serve.

In addition, in 1996 the State established a behavioral health and substance abuse managed care program, known as Tenn-Care Partners, to be managed by Behavioral Health Organizations (BHOs). The Tennessee Department of Children's Services (DCS) administers certain TennCare behavioral health services[6], and serves as a BHO in that context. TennCare Partners provides benefits to a population of individuals classified by the Department of Mental Health and Developmental Disabilities (DMHDD) as severely and persistently mentally ill (SPMI) adults or severely emotionally disturbed (SED) children. The benefits are to be provided by Tenn-Care Partners to any TennCare child whenever medically necessary.

TennCare also differs from traditional Medicaid in that TennCare provides coverage to an expanded population. Under the terms of the waiver, benefits are made available to those who are "uninsured," defined as individuals who lack insurance coverage and do not have access to group coverage under an employer. In addition, the plan expands coverage to individuals deemed "uninsurable" by commercial insurers because of poor health or previous medical history.[7] This newly covered population is termed "waiver eligible." Waiver eligibles with incomes below the poverty line, receive coverage at no cost to them. Waiver eligibles above the poverty level pay premiums and cost sharing obligations on a sliding scale, based on income and family size.[8]

This case was initially brought in March 1998 on behalf of all individuals under age twenty-one involved in Tennessee's Tenn-Care program. Almost immediately after the case was filed, the parties submitted to the Court a Consent Decree, granting broad declaratory and injunctive relief enforcing the EPSDT provisions of Title XIX of the Social Security Act. 42 U.S.C. § 1396, *et seq.*[9] The Court approved the

---

children in the Plaintiffs' class. Of those in the Plaintiffs' class, approximately 466,000 are in plans for which the State has full or shared risk, and approximately 190,000 are in plans that are at full risk.

5. For example, nursing facility service and home and community-based services, behavioral drug services, are not subject to risk agreements.

6. DCS administers services for children in custody. *See infra.*

7. On October 1, 2001, the State attempted to amend the TennCare plan to exclude uninsurables. Another Court in this District recently preliminarily enjoined the State from enforcement of the proposed amendments. *Rosen v. Tenn. Comm'r of Fin. and Admin*, No. 3:98-0627 (M.D.Tenn.2001)(Haynes, J.).

8. The Court notes that the State has proposed a revision to the TennCare program in its October, 2001 proposed waiver to the TennCare program. See State of Tennessee, Bureau of TennCare, Tenn Care Waiver, available at ht tp://www.state.tn.us/tenncare/waiverdoc.html. However, as the proposal will not even be considered by the Federal Government until the end of this year, the Court will not consider the proposal at this time.

9. The EPSDT provisions were passed in 1967 as part of the Social Security Amendments of 1967 (P.L. 90-248). President Johnson recommended the amendments in early 1967 in response to the lack of medical care for America's poorest children. *See* Welfare of Children, H.R. Doc. No. 54, 90th Cong., 1st. Sess. (1967). In 1989, the Congress bolstered the EPSDT provisions by prohibiting the

Consent Decree on March 12, 1998. (Doc. No. 12).

EPSDT covers a broad range of services. As the name suggests, the purpose of EPSDT is to ensure that all medicaid-eligible children receive regular screening, vision, hearing, dental and treatment services consistent with established pediatric standards.[10] The Federal Code requires that the children receive "such other necessary health care, diagnostic services, treatment and other measures ... to correct or ameliorate defects and physical and mental illnesses under the State plan." 42 U.S.C. § 1396d(r)(5). The purpose of EPSDT is to ensure that underserved children receive preventive health care and follow-up treatment. EPSDT is premised on the idea that early detection of problems will lead to treatment of minor problems before they become major healthcare issues. By preemptively screening, diagnosing and treating current problems, EPSDT staves off larger healthcare problems in the future, and ultimately results in a more efficient and effective healthcare system with a proactive, comprehensive, and long-term focus.

The Consent Decree recognizes and attempts to address deficiencies in State EPSDT services. The Consent Decree directed the State to retain an expert to evaluate EPSDT services for children in or at risk of entering State custody. After the expert, Paul DeMuro, submitted the report in late 1998, the parties submitted two proposed agreed orders relating to EPSDT for children in this subclass. The parties entered into a remedial plan that required the State to take additional steps to improve EPSDT services for children in or at risk of entering State custody, and provided a timetable for implementation. The Court approved the proposed orders in May of 2000. (Doc. Nos.57, 59).

The State, after encountering difficulties implementing the Agreed Orders, filed a motion requesting that enforcement be stayed and requesting modification of the Agreed Orders. (Doc. Nos.63). On January 29, 2001, Plaintiffs filed a motions to show cause (Doc. No. 79), in which they alleged that the State Defendants were in contempt of court for violating both the original 1998 Consent Decree and the May 2000 Agreed Orders. The Plaintiffs requested a finding of contempt, imposition of sanctions and the appointment of a special master. This Court heard arguments from both Plaintiffs and Defendants on the above motions for a total of three weeks in June, July and early August 2001.

The Court finds that Plaintiffs' Motion to Show Cause does have some merit, and appropriate relief is therefore granted to the Plaintiffs, as discussed in detail below. In Part Two, the Court will discuss Defendants' Motion to Stay Enforcement and Motion to Modify the May 2000 Agreed Orders.

## I. Findings of Fact

### A. The State's Efforts to Implement the March 1998 Consent Decree

1. The Defendant State officials have attempted to comply with and implement the 1998 Consent Decree. The record demonstrates that the Defendants have been, for the most part, well-intentioned and diligent in attempting to comply with both the Consent Decree and federal EPSDT requirements. In fact, Defendant officials sometimes attempted to imple-

---

states from restricting EPSDT benefits to benefits offered under a state's Medicaid program. Omnibus Budget Reconciliation Act of 1989. Pub.L. No. 101–239, § 6403, 103 Stat. 2106, 2262–64, codified at 42 U.S.C. § 1396d(r)(2001). In effect, this was a recognition of the broad scope of EPSDT.

10. Consent Decree, pp. 4–5.

ment the very strategies that Plaintiffs' counsel advocated, but were constrained by the realities of State Government.[11] TennCare employees are committed to the mission of TennCare-the provision of health and mental care to eligible individuals in Tennessee. For example, with the hiring of Ken Okolo and Kasi Tiller,[12] the State Defendants committed to expending resources to achieve compliance with federal law and the Consent Decree.

2. The record also indicates that TennCare and the other State Defendants have tried to work within the TennCare managed care system to achieve compliance. From the beginning, TennCare has attempted to comply with some of the concrete provisions of the Consent Decree. For example, TennCare published a Standard Operating Procedure regarding EPSDT early in 1999, and continue to operate within these parameters.[13] Additionally, the State has revised BHO and MCO contracts on a number of occasions to reflect commitments under EPSDT.[14]

3. However, from the beginning, the State's efforts have been hampered by institutional inefficiencies and fundamental problems associated with the TennCare system. The record shows that the Defendants' efforts were indeed scuttled because "essential providers and tertiary pediatric care centers refused to contract with all of the managed care companies currently participating in the TennCare program." [15] The record also confirms that the Defendants have faced a challenging task in melding Medicaid and managed care—a challenge that is by no means unique to Tennessee.[16] Nevertheless, the institutional difficulties faced by the Defendants do not excuse their failure to follow the law. Defendants have not shown why their failure to fully comply with the 1998 Consent Decree or federal law should be excused, and thus have neither proven compliance nor any excuse for failure to comply with the federal EPSDT provisions. Therefore, Defendants have failed to show why the Consent Decree should be modified,

4. The TennCare system represents an innovative but ultimately failed experiment in the provision of federally-mandated health services to a needy population. Although the record indicates that Defendants' employees are well-intentioned and innovative,[17] the system in which they op-

---

11. For example, Commissioner John Tighe expressed his frustration with not being able to implement certain policy recommendations, and noted that his efforts were constrained by others in State Government. Pl. Exh. H 5, p. 12.

12. Director of Quality Oversight and former Director of Policy and Planning, respectively, for TennCare.

13. Baird Test., Trans. (Vol.XVIII G), p. 2448; Def. Exh. No. 40.

14. Def. Exh. No. 39. (MCO and BHO Contract Amendment Highlights).

15. Def. Pre Trial Br., Doc. No. 123, at 9

16. See Rosenbaum test, Trans. (Vol.IV), p. 557, 561; see generally, Medicaid: Stronger Efforts Needed to Ensure Children's Access to

Health Screening Services, GAO–010749, G.A.O. Report to Congressional Requesters (July, 2001)(discussing problems associated with providing EPSDT services to children in states with a managed care system).

17. The Consent Decree itself recognized that State officials' development of the Consent Decree is "itself evidence of their genuine commitment to reform." Consent Decree, ¶ 30. As the Plaintiffs acknowledge, most State employees are "dedicated and able" and "aware of the problems" associated with the current state of TennCare. Pl. Post Trial Br. at 248. See testimony of Mark Reynolds, TennCare, Trans. (Vol XIII, p. 1614–15) (Indicating that those in charge of the TennCare program have been dedicated and able).

erate makes it impossible to fully comply with federal mandates.[18]

### B. EPSDT Failures

*Outreach*

5. Pursuant to the Consent Decree, Defendants have a responsibility to achieve and maintain outreach efforts designed to reach all members of the Plaintiff class with information and materials in conformance with federal law.[19] Plaintiffs allege that the Defendants did not adopt the necessary outreach strategies.[20] The record reflects the fact that the Defendants mostly delegated the responsibility to conduct outreach to MCOs and BHOs, who have not successfully implemented the outreach requirements contained in the Consent Decree. However, the Defendants are ultimately responsible for conducting proper outreach. If the Defendants choose to delegate this responsibility, they must do so with the understanding that they will remain ultimately responsible for the failure of any delegatee.

6. The Consent Decree requires that the Defendants "aggressively and effectively inform enrollees of the existence of the EPSDT program, including the availability of specific EPSDT screening and treatment services." [21] The Decree also requires that the "Defendants or their contractors shall achieve within 240 days and shall maintain thereafter, EPSDT outreach efforts designed to reach all members of the plaintiff class with information and materials ... [as required under federal law]." [22] In addition, the Consent Decree requires that Defendants engage in oral outreach,[23] as well as outreach specifically devised to inform individuals who are illiterate, blind, deaf, or non-English speakers.[24] However, the State has not successfully implemented the outreach contemplated by the Consent Decree. The outreach conducted by and on behalf of the Defendants is inadequate.

7. First, TennCare officials are aware of the Consent Decree's outreach requirement.[25] In fact, TennCare employees specifically cited the Consent Decree's requirements as demanding a coordinated approach by TennCare, and even proposed an involved outreach campaign to ensure TennCare compliance with the Consent Decree.[26] However, TennCare officials were unable to implement this proactive approach, which included oversight of providers to assure that proper outreach is being conducted.[27] TennCare, through its Quality Oversight Department, did review the outreach strategies employed by the

---

18. As discussed in more detail below, the TennCare managed care system provides no incentives for an MCO to provide EPSDT services. Plaintiffs acknowledge that a "dysfunctional" State Government overrides the well-intentioned work of the State Defendants. Pl. Post Trial Brief, at 248.

19. Consent Decree, ¶ 40

20. Pl. Post Hearing Br., Doc. No. 188, at p. 11

21. Consent Decree., ¶ 39(a).

22. Id., ¶ 40.

23. Id., ¶ 39(c)(The State must "provide a combination of written and oral information so

that the program is clearly and easily understandable.").

24. Id., ¶ 39(d).

25. Tiller Dep. (Pl.Exh. P 23), p. 48–49.

26. Pl. Exh. B–1, p. 1–21 (Tiller letters and plans for coordinated outreach efforts).

27. Okolo Dep. (Pl.Exh. P 23), p. 106. (Deposition of Director of Quality Oversight at TennCare, testifying that outreach was "going o.k ... because that's what most people do. Most businesses try to connect with their customers, which is what outreach is."). Although Ms. Tiller understood the need for a coordinated approach, her letters and proposals were apparently not heeded.

MCOs.[28] TennCare also formulated a survey to ascertain what methods of outreach each MCO was utilizing.[29] However, the record does not clearly indicate that Tenn-Care actually used the surveys and reports to correct the MCOs' deficient outreach efforts. TennCare, not the MCOs, is the party bound by the Consent Decree, and TennCare has failed to assure proper outreach activities by the various agencies that are involved in the TennCare program.

8. Second, the evidence presented at trial demonstrates that some outreach activities are more effective than others. While State officials have opined that "[n]o strategy [has] necessarily been proven better than the other," [30] they implicitly acknowledge that other states have effectively and creatively conducted outreach activities.[31] The evidence submitted at trial proves that the State's strategy of mailing fliers and brochures [32] to inform Tenn-Care recipients of their EPSDT rights is inadequate. The State is aware that its outreach strategies are insufficient. In fact, at least one TennCare employee recognized that a statewide broadcast and media campaign was necessary in order to inform children and their parents of EPSDT.[33] Therefore, although TennCare

MCOs did engage in outreach, and even conducted outreach in Spanish [34] and other languages, the outreach conducted was ultimately ineffective.

9. The State maintains that allowing different MCOs to conduct outreach in different ways will ultimately benefit all MCOs by allowing the contractors to share their successes and failures.[35] The State presented evidence from representatives of four MCOs at trial, and those representatives detailed the varied approaches that those MCOs take to outreach.[36] For example, OmniCare Outreach Coordinator Vickie Bouscher testified that OmniCare sends members EPSDT reminders on their birthdays, gives pregnant women a pager to enable OmniCare to contact them, and provides EPSDT materials in languages as varied as Somalian and Vietnamese.[37] However, Ms. Bouscher also stated that TennCare does not require any specific baseline standards for EPSDT.[38] Mia Earl–Clemmons, the TLC representative, testified that although TennCare tells TLC that it needs to conduct outreach, TennCare does not specifically require a certain method of outreach.[39] The evidence submitted at trial demonstrates that TennCare does not require a base level for

28. Pl. Exh. B 4.

29. Pl. Exh. B 5.

30. Tiller Dep., pp. 51–52.

31. Tiller test., Trans (Vol.IX), pp 68, 84–85, 88–89.

32. Okolo Dep., p. 106.

33. Tiller Test. Trans. (Vol.IX), p. 62. Due to budgetary constraints, however, the State did not implement outreach proposals of Ms. Tiller.

34. *See, e.g.,* Preston Test., Trans. (Vol.XVIII A), p. 2265; Def. Exh. No. 48 (Access Med Plus EPSDT brochure in Spanish).

35. Thornton Test., Trans. Vol XIX, p. 2519; Okolo Test., Trans. (Vol.XIX), p. 2555–56.

36. Preston Test. Trans. (Vol.XVIII A), pp. 2258–61; Earl Clemmons Test., Trans. (Vol.XVIII G), pp. 2407–08; Thornton Test., Trans. Vol. IX, pp. 2508, 2512–13; Boucher Test., Trans. Vol. XIX, pp. 2603–05.

37. Boucher Test., *supra,* at 2594–2606.

38. *Id.* at 2613.

39. Earl Clemmons Test., *supra,* at 2422–23.

EPSDT oversight on the part of its contractors.

10. Most importantly, the trial record demonstrates that at least some TennCare members and their parents were unaware of what EPSDT represents, or even that it conferred certain benefits upon them.[40] One parent, Amy Defreece stated that no one from TennCare ever spoke to her about EPSDT for her daughters, and that she did not receive any written information concerning EPSDT.[41] Another, Jennifer Stewart testified that she had never heard of EPSDT, and that she was never told about services and screenings available for her sons under EPSDT.[42] Freda Kinnie, mother of a TennCare recipient, testified that no one from her MCO (BlueCare) or TennCare had ever discussed EPSDT with her, although she did receive a card in the mail once a year reminding her of a yearly check-up.[43] TennCare clearly did not succeed in informing these individuals of EPSDT.

### Screenings

11. Under the Consent Decree, the State must comply with the federal requirements for EPSDT screens.[44] An adequate screen must contain all components required by EPSDT law. The State was to create a committee that would devise a plan and specific guidelines to ensure the effectiveness of the screens.[45] Additionally, the Consent Decree specified a method for quantifying and measuring screening performance, and established goals over time for adjusted periodic screening percentage (APSP) rates.[46]

12. Specifically, the State agreed to improve its APSP annually, and reach a goal of 80% by September, 2001.[47] The Defendants' proof submitted at trial indicated that the State has failed to meet its goals. The adjusted screening rate for 1999 was 19.8% and rose to 31.5% in 2000, far short of the baseline goals for those years, and the ultimate goal of 80% for 2001.[48] Dental screening rates also fell short of their targets.[49]

13. The Consent Decree also required that 100% of Children in State custody were to receive full EPSDT screening after September 1999.[50] As of May, 2001, 91% of children in State custody had received the appropriate screens.[51] Although this figure is still short of the 1999 target, the 91% may be inflated because it

---

40. The Court is aware that the Plaintiffs' witnesses present a skewed subsection of the TennCare population. Nevertheless, these individuals represent TennCare members and parents that were not aware of EPSDT.

41. Defreece Dep., Pl. Exh. P 8, p. 14.

42. Stewart Test., Trans. (Vol.III), p. 474.

43. Kinnie Test., Trans. (Vol.IV), p. 605.

44. Federal law requires: (1) screening services; (2) vision services; (3) dental services; (4) hearing services; and (5) "such other necessary health care ... to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered by the State plan." 42 U.S.C. § 1396d(r) (2001).

45. Consent Decree, ¶ 44

46. Id. ¶ 45–47

47. Id. ¶ 50.

48. Pl. Exh. C–65, p. 1; July 2001 Semi Annual Progress Report (Doc. 158), p. 8.

49. The Consent Decree requires that the Defendants achieve an 80% screening rate by September 30, 2003. As of the filing of the semi-annual report in 2000, only 33% of all TennCare children received dental screening that the met all of the legal requirements. July 2001 Semi Annual Report (Doc. No. 158), p. 8.

50. Consent Decree, ¶ 52

51. July 2001 Semi Annual Report (Doc. No. 158), p. 8.

may not represent fully EPSDT-compliant screens [52] because the Department of Children's Services (DCS) reports a child having been adequately screened even if that child has not received the seven components required by federal law.[53] In addition, screens are often conducted more than thirty days after the child has entered custody, after the child's plan of care has already been established, thus minimizing the effect of the screen on the child's actual care.[54]

14. The Consent Decree also requires that the State develop adequate screening guidelines via an EPSDT Committee, and that the State adopt the guidelines as components of EPSDT screening guidelines for the TennCare providers.[55] The State formed a Guidelines Committee, which met over a period of sixteen months to make recommendations for screening guidelines.[56] The Committee was initially briefed on its duties under the Consent Decree [57], and given a specific mission.[58] For the most part, the Committee followed its original mission.[59] The Court finds that

the committee's recommendations are sound, and, if fully implemented, may be effective.[60] However, the record does demonstrate that the Committee's recommendations have not been fully implemented by the providers,[61] although the Committee did disseminate its guidelines to the providers.[62] Nevertheless, the parties stipulated to the fact that "no document exists that proves that the screening guidelines developed by the Screening Guidelines Committee are mandatory for the MCOs/BHOs and their network providers." [63]

15. Defendants have made progress in achieving the target screening rates by contractually requiring their contractors to meet certain EPSDT screening goals. The most recent contracts [64] show that an MCO that has not reached an 80% adjusted screening ratio is now required to contract with the county health department to perform EPSDT screenings.[65] In addition, the MCOs receive rewards when they reach certain baseline screening ratio levels.[66] State employees also testified at

---

**52.** Franklyn test., Trans.(Vol.XV), pp. 1869–1870.

**53.** *Id.*

**54.** Franklyn Depo. Pl. Exh. P–12, p. 128; Pl. Exh. 0–6, pp. 6–7 (Audit of Primary Treatment Centers).

**55.** Consent Decree, ¶ 44.

**56.** McLaughlin Test., Trans. (Vol.XII), p. 1634.

**57.** Pl. Exh.—57.

**58.** *Id.,* attach. No. 1.

**59.** As time passed, the committee began to focus on standards that are "practical, and which do not place an undue burden upon providers." Pl. Exh. 61, p. 2. (Committee Minutes, October 9, 1998). However, the record does not indicate that the committee ignored its duties under the Consent Decree.

**60.** Plaintiffs' expert, Dr. Heflinger, testified that the EPSDT Committee's recommendations were insufficient. Trans. (Vol.VII A), p. 1054. However, Dr. Heflinger's expertise is limited to mental health areas, and the Court does not find that the EPSDT committee's recommendations are inherently inadequate.

**61.** *See e.g.* Pl. M 81, Letter from Karen Oldham to Mark Reynolds, indicating that screens were not being performed adequately as of late 2000.

**62.** Def. Exh. 81, p. 20 and attach. VIII

**63.** First Stipulation of Facts, ¶ 15.

**64.** Def. Exh. 81 (2001 contract), § 2–9.d.2; Def. Proposed Findings of Fact and Conclusions of Law, ¶ 13.

**65.** Reynolds, Trans. (Vol.XII), p. 1492.

**66.** *Id.* at 1488.

trial that as of the Summer of 2001, all ninety-five county health departments are providing EPSDT screenings.[67]

### Diagnosis and Treatment

16. Pursuant to the Consent Decree, children are to be referred for a more sophisticated assessment and diagnosis as indicated by properly conducted periodic screens, or as otherwise medically necessary.[68] In practice, the Government's attempts to ensure compliance with this aspect of the Consent Decree have been undermined by the efforts of the MCOs and BHOs, and inadequate provider networks.[69] Defendants were fully aware of the deficiencies in the TennCare network,[70] and have recently taken steps to increase provider participation by, for example, providing a State guarantee to share the financial risk with providers.[71]

17. As discussed above in relation to outreach and screening, systemic deficiencies have also made compliance with the Consent Decree's diagnosis provisions difficult. First, where there are overlapping medical and mental health issues, the MCOs and BHOs quibble over which entity is responsible for providing coverage. The State's TennCare contracts contribute to this ambiguity by sometimes failing to specify the responsible party, even though the BHOs do have coordination agreements with MCOs[72] In practice, individuals with overlapping issues sometimes "fall in the cracks"[73] and fail to receive services from either a BHO or MCO, as with, for example, attention deficit disorder patients.[74]

18. Additionally, the MCO and BHO contractors often refuse to authorize health assessments. Larry Faust of the Department of Health testified that even when MCOs and BHOs authorized services, they sometimes refused to pay the provider once the service was rendered.[75]

19. Even worse, the State's managed care system often provides incentives for financially-motivated denials of coverage by both MCOs and BHOs.[76] TennCare's contractors essentially gamble that they will be able to provide services to TennCare enrollees and still be able to make a profit. Tennessee pays the MCOs and BHOs a set amount of money for all of the services that an individual requires. Hence, the contractors have an incentive to cut costs by denying coverage.

20. Further, as discussed above, MCOs and BHOs often lack adequate provider

---

**67.** McLaughlin Test., Trans. (Vol.XIII), pp. 1652–53; Reynolds, Trans. (Vol.XII), p 1482.

**68.** Consent Decree (Doc. No. 12), ¶ 53.

**69.** Reynolds Dep., Pl. Exh. P 27, p. 41 (inadequate dental, specialist groups); Tighe Dep., Pl. Exh. P 32, p. 164 (inadequate behavioral health network); Demuro Dep., Pl. Exh. A 5, p. 60 (children's network); McLaughlin Dep., Pl. Exh. P 18, p. 11 (prenatal care).

**70.** A 1999 Performance audit of the Department of Health finds that "... TennCare ... has experienced access/ provider network problems since its inception, and there is no evidence these problems will be solved in the near future." Pl. Exh. M 18, p. 36.

**71.** Tighe Test. Trans. (Vol I), p. 33–34.

**72.** Cagle Test, Trans. (Vol.XVII A), p.2054–2056. Ms. Cagle is Vice President for Planning and Program Development for Advo-Care, a management company for TennCare's BHO.

**73.** Reagan Dep., P–25, p. 67 (discussing how certain issues, such as autism, are often controversial and result in difficulty providing services).

**74.** Helfinger Test., Trans. (Vol.VII A), pp. 1028–1031.

**75.** Faust Dep., Pl. Exh. P–11, p. 21.

**76.** Rosenbaum Test., Trans. (Vol.IV), p. 564 (discussing financial incentives for denying care).

networks, creating a barrier to adequate diagnostic evaluations.[77] The lack of provider networks is attributable, in part, to the failure of the BHOs and MCOs to pay its providers for services rendered.[78] The lack of a provider network is also attributable to a scarcity of certain specialists across the nation.[79] While the State notes this problem, it has been unable to stop the hemorrhaging of the provider networks. The proof at trial demonstrates that, in some circumstances, provider participation has drastically declined.[80]

21. Compounding this problem is the fact that children enrolled in plans with inadequate provider networks find it difficult to obtain an out-of-network diagnosis because of the health plans' poor payment history.[81]

22. The TennCare Bureau has implemented an appellate procedure, pursuant to this Court's Order in *Grier v. Neel*.[82] However, the record demonstrates that even where the TennCare Bureau agrees that a denied service is medically necessary, the State routinely grants the BHOs and MCOs a 'good cause' extension of time in which to provide services that the TennCare Solutions Unit has deemed medically necessary.[83] The trial record is that children often wait for extended periods of time to receive medically necessary services. For example, an e-mail from Jack Welch to Mark Anderson admits that medically necessary services were not rendered in the Shea O'Neill case, a case that was admittedly "seriously past due."[84] The Child's DCS case manager expressed his frustration not only with the "utter indifference" with which the MCO handled the child's case, but also the inability of TennCare to compel the MCO to provide services.[85] The record reflects similar situations involving medically necessary services that, for various reasons, were either delayed or never provided to the patient.[86]

23. On the behavioral/ mental health side, the BHOs sometimes fail to connect children to an appropriate diagnostic resource capable of performing the required behavioral health assessment.[87] As with MCOs, there is an inadequate provider network for psychologists, psychiatrists and other behavioral health professionals.[88] The record also demonstrates that State policy makers are well-aware of the limited BHO provider network.[89]

**77.** Pl. Exh. O–1, pp. 99–102. (Tr. of 5/8/01 Hearing in Greer Case); supra note 50.

**78.** Hickman Test., Trans. (Vol.II), p. 278.

**79.** Farmer Dep., Pl. Exh. P–10, p. 115 ("We don't have as many child psychiatrists as we would like to have, but that's true all across the United States").

**80.** *See e.g.,* Underwood Test., Trans. (Vol.XI), p. 1419 (indicating that dental network has experienced steep decline in provider participation).

**81.** *See, e.g.,* Griffin Test., Trans. (Vol.V), pp. 763–765.

**82.** No. 79–3107 (Consent Decree regarding due process required in the managed care context, including notice and appellate provisions)(Revised Consent Decree, Doc. No. 630).

**83.** Welch Dep., Pl. Exh. P 35, p. 50–52.

**84.** Pl. Exh. L–99, p. 6 (case involving a delay in provision of services that were first denied by Access Med Plus, but then deemed necessary after a DCS regional representative filed an expedited appeal with TennCare).

**85.** *Id.* at p. 17–19.

**86.** *See, e.g.* Pl. Exh. L–61, p. 3–5,; L 153, p. 1–6 (allowing delay due to bare MCO claim of "good cause").

**87.** Hudson test., Trans. (Vol.VI A), pp. 826–827.

**88.** Heflinger Test., Trans. (Vol.VII A), p. 1055.

**89.** Tighe Dep., Pl. Exh. P–32, p. 164; Reynolds Dep., P–27, pp. 41–43.

24. The record reveals that a number of the providers within the limited BHO provider network are not taking new patients, thus rendering those providers unavailable to new TennCare patients.[90]

25. Additionally, there is only one BHO in Tennessee.[91] The BHO does engage in some oversight, as the testimony of Deborah Cagle, Vice President at Advocare, demonstrates. Ms. Cagle testified that Advocare reviews and audits its providers, and has hired an independent auditor to review Advocare's providers.[92] However, the record shows, that although there is only one BHO, the State has failed to adequately monitor the BHO's provision of EPSDT and Consent Decreemandated services. More specifically, the State has not ensured that the BHO strictly mandate that its providers offer adequate services to their patients. The testimony of Dennis Elliot, Manager of the Network Adequacy Unit at TennCare, demonstrates that TennCare does not adequately assure that the BHO corrects deficiencies in the BHO's provider network.[93] Specifically, Mr. Elliot testified that TennCare requires the BHO to submit a corrective action plan to TennCare in order to address a deficiency. However, that action plan is approved if "it addresses deficiencies that [TennCare has] outlined, or if it is consistent with [TennCare's] findings that ... provider[s] of [a certain] type ... do not exist [in a given area]."[94] Thus, while the State does supervise the BHOs and even requires that they submit corrective action plans, the trial record does not indicate that those corrective action plans are actually binding, but only that the BHO draft a corrective action plan that addresses a deficiency or explains it away. TennCare oversight, while seemingly well-intentioned, is insufficient in a managed care system, where BHOs must be closely monitored.

26. Thus, children frequently do not receive appropriate diagnoses through the TennCare managed care system. Defendants admit that "sometimes the system breaks down,"[95] and the Court finds that in this case, the State Government's healthcare system has indeed broken down. However, the system itself is to blame for TennCare's failures. A depleted provider network and lack of proper oversight by MCOs and BHOs is directly attributable to the TennCare managed care system, which has proven to be unable to fully comply with both the EPSDT and the Consent Decree's requirements for proper diagnosis of children under 21.

### Coordination of Services

27. The Consent Decree requires that the various agencies responsible for health, education, and social services coordinate their efforts. Specifically, the Consent Decree requires that the agencies formulate interagency agreements, and meet and communicate regularly to ensure that the agreements are implemented.[96] Clearly, State employees recognize the need for coordination among the various agencies. Former Deputy Commissioner John Tighe stated that coordination and interaction between various State departments is an

90. Id.

91. Both Premier Behavioral Health of Tennessee and Tennessee Behavioral Health are owned by Magellan, whose subsidiary, Advocare, manages their TennCare operations. Salter Dep, Pl. Exh. P–28, pp. 5, 92–93.

92. Cagle Test., Trans. (Vol XVII A), p 2138–2141.

93. Elliot Test., Trans. (Vol.XIX), p. 2647–48, 2660–63.

94. Id. at 2662.

95. Def. Post Tr. Br., p. 34.

96. Consent Decree (Doc. No. 12), ¶ 83.

essential aspect of a health program designed to provide the best services to children.[97] TennCare has now entered into agreements with the Departments of Education, Mental Health and Developmental Disabilities, and DCS.[98] Coordination among State agencies is formalized by Commissioner Tighe's responsibility as Deputy to the Governor for Health Policy. Included in this new office is the new Children's Health Initiative, directed by Dr. Joseph McLaughlin, which is responsible for coordinating EPSDT compliance and adjudicating disagreements among various health agencies.[99]

28. In addition, the Consent Decree mandates that the State oversee the implementation of clinical case management, as required by federal law.[100] The case management services available to TennCare enrollees are insufficient. Plaintiffs' proof included the testimony of a number of parents of children with serious healthcare needs, the very children that are most in need of case management. Although the Department of Children's Services continues to increase the number of case managers it employs,[101] the testimony of the various parents demonstrates that, at least in some circumstances, case management is often insufficient.[102] The State put forth evidence that it is making progress in increasing the number of case managers, aided in part by the Consent Decree in the

*Brian A. v. Sundquist* case.[103] However, the Court cannot consider future promises of increased case managers in determining whether the State is currently complying with the Consent Decree and federal law.

29. The State is also required to issue and implement procedures to facilitate coordination among various contractors. Although the State issued its contractors a list of other agencies and programs with which they should coordinate EPSDT services, the exchange of information between contractors remained "disorganized" and few of the Defendants' proposals to achieve coordination were implemented.[104] Coordination between various private health agencies is still inadequate. The lack of coordination among various non-governmental agencies is directly attributable to the very system under which public health is administered. Tennessee State government has failed to properly coordinate and implement proper case management and coordination services.

## II. Conclusions of Law

### A. Jurisdiction

The court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), as the action implicates 42 U.S.C. § 1396 *et seq.*

### B. Consent Decree

■ A Consent decrees is both a contract between the parties and an order of

---

97. Tighe Dep., (Pl.Exh. P 32), p. 54

98. Baird Test., Trans. (Vol XVIII G), pp. 2450–51.

99. McLaughlin Test., Trans. (Vol.XIII), p. 1624–25, 1628, 1632.

100. Consent Decree (Doc. No. 12), ¶ 70.

101. Steverson Test., Trans. (Vol.XIV), pp. 1708–9. (Indicting that the number of DCS case managers increased from 730 in 1998 to 1100 at the time of the hearing. The number will reach 1351 by the end of 2001).

102. Hulen Test, Trans. (Vol.IV), p. 640 (indicating that daughter Bayli never had a case manager assigned to her by the BHO); Griffin Test., Trans. (Vol.V), p. 760 (describing the 'case management' that she has to provide for her children by 'working the system').

103. No. 3: 00–0445 (M.D.Tenn.2001). However, that case only pertains to children in foster care, and thus is not applicable to a large number of the class members in this case.

104. Pl. Exh. M–26, p. 14.

the Court. *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992); *Lorain NAACP v. Lorain Bd. of Educ.*, 979 F.2d 1141 (6th. Cir.1992); *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir.1983) (A consent decree is both "a voluntary settlement agreement which could be fully effective without judicial intervention" and "a final judicial order . . . plac [ing] the power and prestige of the court behind the compromise struck by the parties."). In enforcing a Consent Decree, a court's interpretation is limited by its language. As the Supreme Court noted, "the scope of a consent decree must be discerned within its four corners." *United States v. Armour & Co.*, 402 U.S. 673, 682, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971). However, where the Consent Decree references federal law, the court is bound to look to the law that serves as the foundation for the four corners of the consent decree. *See Frew v. Gilbert*, 109 F.Supp.2d 579 (E.D.Tex.2000)(noting that a court may stray from the four corners of a consent decree "to the extent that [Medicaid Act] requirements are clearly imported by the language of the decree.").

### C. EPSDT Deficiencies

■ Because Tennessee accepts federal funding for its Medicaid program, it must comply with the relevant federal laws. *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 502, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). Although the State has received a federal Medicaid waiver, it is still bound to comply with the federal EPSDT requirements, even if the State utilizes a managed care system. 42 U.S.C. § 1396u–2.

■ Accordingly, the State is bound by federal law to provide "medically necessary" EPSDT services that fall within the scope of services listed at 42 U.S.C. § 1396d(e) to all state residents under the age of 21. The State has discretion with respect to the provision of these services, so long as the plan "complies satisfactorily" with federal law. *Chisholm v. Hood*, 110 F.Supp.2d 499, 506 (E.D.La.2000).

The EPSDT section of the Medicaid Act creates specifically-enforceable rights. *Frew*, 109 F.Supp.2d at 655–656. Additionally, the language of the EPSDT provisions is mandatory, not precatory; the provisions describe what the state must do, not what it may do. *Wilder*, 496 U.S. at 502, 110 S.Ct. 2510; *Frew, supra*, at 662–663.

■ Although States may take advantage of Medicaid waivers under Section 1915 of the Social Security Act, the "waiver may not be used to deny, delay, or limit access to medically necessary services that are required to be available to all Medicaid-eligible children under federal EPSDT rules."[105] EPSDT services are not optional, and may not be limited, even pursuant to a Medicaid waiver.[106]

■ The record shows that Defendants have failed to meet the federal EPSDT requirements. However, the Court also notes that the State's failure to adequately meet EPSDT requirements predates the TennCare program. Nevertheless, the TennCare program has exacerbated the State's EPSDT violations. The State Defendants now work within a system that makes compliance virtually impossible.[107] The TennCare system was established to

---

**105.** January 10, 2001 letter from Health Care Finance Administration (now the Centers for Medicaid and Medicare Services (CMS)) to State Medicaid Directors.

**106.** The Court is unsure of the current feasibility of obtaining an EPSDT waiver.

**107.** As discussed elsewhere, managed care creates incentives for cutting costs and denial of care. However, commentators have rightly observed that managed care, at least in theory, would appear to be an ideal model for the delivery of EPSDT services because it pro-

allow the managed care entity to accomplish most of the administrative tasks associated with the provision of health services to the Medicaid population.[108]

EPSDT cannot be simply relinquished to the MCOs, as the State remains ultimately bound by the EPSDT regulations. *Frew,* 109 F.Supp.2d at 631. The State contracts with MCO providers to provide TennCare services, and most of what TennCare does has to happen through its contracts with the MCOs and BHOs.[109] The State's most recent contract with the MCOs spells out the scope of benefits covered under EPSDT, and clarifies whether the MCO, BHO or the State is responsible for providing the individual services.[110] The contract also requires that "all provider agreements must contain language that references the EPSDT benefit package found in Attachment IX and the agreement shall either physically incorporate Attachment IX or include language to require that the attachment be furnished to the provider upon request."[111] Hence the contracts, the documents that enable TennCare to actually implement its mandates, contain only general aspirational language regarding the contractors' duties under EPSDT, rather than clear, unambiguous language requiring absolute compliance with EPSDT.[112] The contracts reflect a "trickle down" approach to EPSDT, whereby hortatory language by the State will result in similar language by the contractors, which ultimately will lead to the providers following the EPSDT mandates. However, EPSDT does not trickle down; it requires hard work and mandatory language.[113]

Defendants disclaim responsibility for the ultimate provision of EPSDT-compliant services by a once-removed provider. However, as stated by another court in the Medicaid context, "[t]he public policy implications of Defendants' position, if accepted, would be devastating. It is patently unreasonable to presume that Congress would permit a state to disclaim federal responsibility by contracting away its obligations to a private entity." *J.K. By and Through R.K. v. Dillenberg,* 836 F.Supp. 694, 699 (D.Ariz.1993). Clearly, the failure of State contractors to follow the federal requirements does not relieve the State Defendants of their responsibilities.[114]

---

motes preventive and primary care. However, in practice, the first of these incentives appears to outweigh the latter. In practice, MCOs and BHOs do not appear to take a long-term approach to the provision of EPSDT services in order to prevent future expenditures in the future. *See Medicaid: Stronger Efforts Needed to Ensure Children's Access to Health Screening Services,* GAO-010749, G.A.O. Report to Congressional Requesters (July, 2001)

**108.** Reynolds Test., Trans. (Vol.XII), p. 1470.

**109.** *Id.* at 1468.

**110.** Def. Exh. No. 81 (2001 Contract), attachment IX.

**111.** *Id.*, p. 90, 2–18.nn.

**112.** The American Academy of Pediatrics' "Medicaid Policy Statement" recommends that managed care contracts "clearly specif[y]" the EPSDT benefits. 104 Pediatrics 344–347 (1999).

**113.** In fact, the American Academy of Pediatrics recommends that State Medicaid agencies should closely monitor access, treatment, and provision of diagnostic and treatment services under EPSDT. *Id.*

**114.** *See generally* Sylvia A. Law, *Health Care in Hawai'i: An Agenda for Research and Reform,* 26 Am. J.L. & Med. 205, 222–23. ("The State may not avoid EPSDT obligations simply by contracting with a managed care organization and requiring them to meet those obligations. Rather, the State must assure that comprehensive screening, diagnosis and treatment services are actually provided on a timely basis.").

The State has failed to ensure compliance with all aspects of the EPSDT mandate: outreach, screening, treatment, and coordination.

(i) Outreach.

First, the record demonstrates that although the State has made efforts to assure that EPSDT requirements are carried out by the MCOs, the outreach activities conducted by the State contractors are deficient. While it is true that there is no single outreach method that is necessarily superior to all others, some outreach strategies are better than others. The State must assure that the contractors provide adequate outreach efforts. In fact, both the Consent Decree and federal law require the State to do so. The federal code requires that a state plan for medical assistance must provide for:

> informing all persons in the State who are under the age of 21 and who have been determined to be eligible for medical assistance ... of the availability of early and periodic screening diagnostic, and treatment services ...

42 U.S.C. § 1396a (a) 43(A). Implementing regulations further provide that the State must:

> (1) Provide for a combination of written and oral methods designed to inform effectively all EPSDT eligible individuals (or their families) about the EPSDT program.
> (2) Using clear and nontechnical language, provide information about the following—
> (i) The benefits of preventive health care; (ii) The services available under the EPSDT program and where and how to obtain those services; (iii) That the services provided under the EPSDT program are without cost ...; and (iv) That necessary transportation and scheduling assistance ... is available to the EPSDT eligible individual upon request.

.    .    .    .    .

42 C.F.R. § 441.56(a)(2001). Hence, although there is no "right" way to conduct outreach, the federal code and regulations certainly set forth guidelines for effectively conducting outreach. Thus, although a court may have a difficult time defining what adequate outreach is, it is easy to determine what it is not. In *Salazar v. District of Columbia,* the court found that an English-only form asking Medicaid recipients if they wish to have EPSDT services was an insufficient form of outreach. *954 F.Supp. 278 (D.D.C.1996).* While the outreach conducted by the State and its providers in this case was more substantial than in *Salazar,*[115] the fact that in *Salazar* individuals did not have enough information to adequately assess whether they required EPSDT services is similarly applicable to TennCare. Under TennCare, even where people received physical notification of the EPSDT program, that information was not presented in a useful and informative form. The federal code requires that the State inform all eligible persons of the availability of EPSDT services. A person can only be deemed "informed" when she has enough information to determine that she has been informed in the first place. Here, the fact are that various individuals were not made aware of their rights under EPSDT, and that this was, a least in part, directly attributable to the failure of the State to utilize effective forms of outreach. The State has failed to pro-actively assure that its contractors conduct effective outreach.

---

**115.** For example, the record indicates that materials were available in Spanish as well as English. *See, e.g.,* Def. Exh. No. 48.

TennCare employees appear to hold a laissez faire attitude toward the EPSDT outreach procedures of their contractors, preferring to allow the contractors to creatively reach out to their patient populations.[116] That approach has not yielded effective outreach. Creative government is only effective when that creativity spurs positive change. The MCOs' outreach efforts have been insufficient, and the State has failed to engage in adequate oversight to ensure adequate outreach. As the Seventh Circuit Court of Appeals recognized twenty-seven years ago, "EPSDT programs must be brought to the recipients; the recipients will not ordinarily go to the programs until it is too late to accomplish the congressional purpose [of EPSDT]." *Stanton v. Bond*, 504 F.2d 1246 (7th Cir. 1974). Indeed, without proper outreach, EPSDT is worthless.

The State's failure to meet the federal EPSDT requirements stems not from its refusal to meet those requirements, but from a fundamental, systemic inability to merge managed care and EPSDT. While managed care recognizes the benefits associated with allowing a non-governmental entity to assume duties that were previously conducted by government, EPSDT demands compliance by the State. Therefore, the State's failure to comply with the Consent Decree's outreach requirements stems, to a large part, from the systemic roadblocks to achieving proper outreach. Hence, the system, not well-intentioned civil servants, is to blame for the EPSDT shortfalls. Nevertheless, insufficient outreach by TennCare and its contractors constitutes a violation of federal EPSDT law. Furthermore, the lack of outreach impacts the ability of the Defendants to comply with other EPSDT requirements: screening, diagnosis and treatment.

(ii) Screening.

The State has failed to meet adequate screening levels under EPSDT and the Consent Decree. The Defendants should be commended for attempting to use performance indicators to reward and penalize its contractors. However, EPSDT is a federal requirement. The State may not simply throw monetary incentives at a contractor, as a trainer throws fish to a sea lion, in order to meet its screening mandates. Meeting EPSDT screening requirements is a duty, not something that merits a reward.

The Federal Code requires that, after a person has been informed of his or her rights under EPSDT, the State is responsible for "providing or arranging for the provision of . . . [EPSDT] screening services in all cases where they are requested." 42 U.S.C. § 1396a(a)(43)(B). Furthermore, the relevant agency regulations provide that:

(1) The agency must provide to eligible EPSDT recipients who request it, screening (periodic comprehensive child health assessments); that is, regularly scheduled examinations and evaluations of the general physical and mental health, growth, development, and nutritional status of infants, children, and youth. As a minimum, these screenings must include, but are not limited to:

(i) Comprehensive health and developmental history; (ii) Comprehensive unclothed physical examination; (iii) Appropriate vision testing; (iv) Appropriate hearing testing; (v) Appropriate laboratory tests. (vi) Dental screening services . . .

42 C.F.R. § 441.56(b)(2001). Additionally, the regulations require that the State agency must implement a periodicity schedule for screening services that "speci-

---

**116.** Okolo Test., Trans. (Vol.IX), p. 2555–  2556.

fies screening services applicable at each stage of the recipient's life. . . ." 42 C.F.R. § 441.58 (2001).

It is clear for the record that not only have Defendants failed to comply with the Department of Health and Human Services' regulations, but Defendants have simply failed to meet the bare requirements of the EPSDT laws. Defendants indicate that low screening rates in this region are partly attributable to both an ill-informed physician corps and a patient population that is not as willing to see a doctor for well-child care.[117] However, Government's job is to inform both the provider and consumer communities of the federal screening requirements. In fact, federal law requires that the State engage in outreach to inform the patients of EPSDT.[118] The Court agrees that Tennessee may have a "harder road to hoe" than some other states, but that does not mean that the entrenched attitudes of providers and patients can be used as a shield against liability for failure to implement EPSDT requirements. Defendants concede that they "have not and will not meet the EPSDT percentages required by the Consent Decree." The Court agrees.

In addition, because the State of Tennessee has not received a waiver of its federal EPSDT duties,[119] the State itself remains liable for assuring compliance with federal EPSDT.[120] As already discussed, the State's Medicaid waiver does not absolve it from its responsibilities under EPSDT. First, the State has failed to adequately assure that its contractors conduct regular screens for all children. Second, even where there are screens, the State has failed to adopt and implement guidelines to ensure their effectiveness. The State Defendants have thus failed to meet their duty to comply with federal EPSDT screening requirements, as well as the Consent Decree's specific screening goals.

(iii) Diagnosis and Treatment.

Federal EPSDT law requires that after the State has engaged in outreach and screening, it is also responsible for "arranging for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment the need for which is disclosed by . . . screening." 42 U.S.C. § 1396a(a)(43)(C). Furthermore, federal regulations require that:

> In addition to any diagnostic and treatment services included in the plan, the agency must provide to eligible EPSDT recipients, the following services, the need for which is indicated by

**117.** Defendants' Proposed Findings of Fact and Conclusions of Law, at 9. (Citing testimony by Mark Reynolds, Director, Bureau of TennCare. Trans. (Vol.XII), p. 1462–4); Gregory Preston, Trans. (Vol.XVIII A), p. 2255.

**118.** 42 U.S.C. § 1396a (a) 43(A)

**119.** The Court is aware of at least two states, Florida and Oregon, that have sought and received an EPSDT waiver. *See* Vernellia Randall, *Section 1115 Medicaid Waivers: Critiquing the State Applications*, 26 Seton Hall. L.Rev. 1069 (1996). As per the Consent Decree, "The State has currently elected, with HCFA approval, to provide non-Medicaid children with the same services provided to

Medicaid eligibles. The parties recognize that the state retains the authority, with HCFA approval, to treat non-Medicaid eligibles differently." Consent Decree, ¶ 17. *See Daniels v. TDH*, et al., 79–3107 N.A. (M.D. Tenn., order entered 6/24/94, Docs. 316, 317). But, to date, the state has not sought or obtained a waiver of EPSDT for waiver eligible children.

**120.** Defendants appear to believe that "the primary responsibility for outreach is in the hands of the health plans, the MCOs." Reynolds Test., Trans. (Vol.XII., p. 1470). However, as discussed above, the ultimate responsibility for compliance with EPSDT lies with the State.

screening, even if the services are not included in the plan:

(1) Diagnosis of and treatment for defects in vision and hearing, including eyeglasses and hearing aids; (2) Dental care, at as early an age as necessary, needed for relief of pain and infections, restoration of teeth and maintenance of dental health; and (3) Appropriate immunizations. (If it is determined at the time of screening that immunization is needed and appropriate to provide at the time of screening, then immunization treatment must be provided at that time.)

42 C.F.R. § 441.56(c)

The State has failed to meet this federal mandate. TennCare does not allow individuals to receive adequate diagnosis and treatment through the various providers. The incentives created by capitated payments to the MCOs and BHOs result in a failure of the State system to assure that each State resident under the age of 21 receives the care that EPSDT mandates. As the Court has previously noted, there are "pecuniary incentives that MCOs [and BHOs] have for denying, suspending, or terminating care under the TennCare system...." *Daniels v. Wadley*, 926 F.Supp. 1305, 1308 (M.D.Tenn.1996).

Therefore, the Court will exercise its equitable powers to find that the State Defendants have violated the federal EPSDT diagnosis and treatment requirements. The TennCare system does not allow for the delivery of necessary diagnosis treatment to the under 21 TennCare population.

(iv) Case Management and Coordination

The Consent Decree and federal law also require that the State coordinate EPSDT services with various other services and programs.[121] Government regulations further provide that "... the [State] should make use of ... public health, mental health, and education program ... to ensure an effective child health program." 42 C.F.R. § 441.61 (2001).

The proof shows that the State has failed to adequately ensure the coordination of EPSDT services among the various governmental, private and non-profit providers of services. The TennCare program, although well-intentioned, is disjointed. Defendants concede that this may have been the case, but they point to the appointment Commissioner Tighe as Deputy to the Governor for Health Policy and Dr. Joseph McLaughlin, Director of the Children's Health Initiative. Although the State has established an office that is essentially dedicated to ensuring EPSDT compliance, that office is powerless to address the Court's greatest concerns with the TennCare program because the office does not have the mandate to directly control the actions of the MCOs or the BHOs.[122] Adding another sailor to a sinking ship will not prevent it from sinking. In the same way, adding yet another layer of bureaucracy to an ineffective TennCare system will not succeed in reforming it.

In many instances children lack a case manager. The *Frew* court recognized that failure to provide case management services may constitute a violation of EPSDT. 109 F.Supp.2d at 674. This Court concurs, and finds that failure to provide adequate

---

**121.** Consent Decree, ¶ 78. Attachment No. 1 to the Consent Decree references Health Care Finance Administration (HCFA)(now the Centers of Medicare and Medicaid Services, CMS) directives mandating coordination and communication among various entities. State Medicaid Manual, § 5320.

**122.** McLaughlin Test., Trans. (Vol.XIII), pp. 1691–1693.

case management services in this case constitute a violation of federal law. Without effective case management, the individual child lacks an effective coordination of various services that he or she needs to ensure that EPSDT services are rendered.

### D. Contempt

■ A Consent Decree is both a contract and an order of the court. Thus, as with any order, the parties have a duty to take "... all reasonable steps within their power to comply with the court's order." *Glover v. Johnson*, 934 F.2d 703, 708 (6th Cir.1991). Courts generally have inherent powers to assure the administration of justice. Foremost among these is the power to punish for contempt. *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 450, 31 S.Ct. 492, 55 L.Ed. 797 (1911); *see also Shillitani v. United States*, 384 U.S. 364, 370, 86 S.Ct. 1531, 16 L.Ed.2d 622 (Courts have "inherent power to enforce compliance with their lawful order through civil contempt."). Accordingly, the Court retains its inherent power to "protect the integrity of the decree with its contempt powers." *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1018 (6th Cir. 1994).

■ To prove a case of civil contempt, Plaintiffs must provide clear and convincing evidence that the State violated the Court's prior order. *N.L.R.B. v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 590 (6th Cir.1987); *Harrison v. Metropolitan Gov't of Nashville and Davidson Co.*, 80 F.3d 1107, 1112. The Sixth Circuit demands substantial compliance with the Court's Order and demands that a party must show they took "all reasonable steps within their power to comply with the court's Order." *Peppers v. Barry*, 873 F.2d 967 (6th Cir.1989). It is not enough for a

party to claim that they made an effort to comply; the law demands substantial compliance with the Court's Order.

If the Plaintiffs successfully prove a violation of the Court's Order, the State may counter by a specific showing of a present inability to comply with the Court's Order.[123] *Id.* Specifically, the State may show that they took all reasonable steps to achieve substantial compliance, and that substantial compliance was, in fact, achieved. *Id.* at 969; *see also United States v. State of Tennessee*, 925 F.Supp. 1292, 1302 (W.D.Tenn.1995). Whether a party has substantially complied with the Court order is determined based on the circumstances of the individual case. *See e.g. id.*

The issue to be determined, therefore, is whether the State Defendants have achieved substantial compliance with the Consent Decree (a court order).

However, because the Court bases this decision on failure to comply with federal law, the Court will hold in abeyance a decision on whether Defendants' actions thus far constitute civil contempt. The Court notes, however, that the Defendants' inability to comply with the Consent Decree and Agreed Orders stems not from their recalcitrance, but from a systemic black hole into which any agreement to comply with a court order would collapse. The record indicates that the State made great efforts to comply with the Court's Orders. However, the Court reserves the right to find Defendants in contempt in the future.

Nevertheless, whereas Defendants may theoretically escape contempt by a showing of substantial compliance with the Consent Decree, federal law requires strict

---

**123.** This is a fairly high burden to reach. *TWM Mfg. Co. v. Dura Corp.*, 722 F.2d 1261, 1273 (6th Cir.1983)(no good faith exception); *United States v. Work Wear Corp.*, 602 F.2d 110, 116 (6th Cir.1979) (financial hardship does not excuse compliance with a court order).

compliance. Hence, the Court finds that Defendants' failure to comply with the EPSDT mandate does constitute a violation of federal law. Although the State Defendants attempted to comply with the Consent Decree, the Decree is itself buttressed by the federal EPSDT laws. Well-intentioned efforts to comply with the law are simply insufficient. After years of attempting to comply with federal law, TennCare, as it relates to the under–21 population, has proven to be unworkable.

### E. Remedy

■ The Court, upon finding that Defendants have violated the federal EPSDT law, must determine what remedy should be imposed. In fashioning the appropriate sanctions, the court must seek to balance intrusiveness and effectiveness of the possible sanctions. *See e.g. Hutto v. Finney,* 437 U.S. 678, 691, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978)(noting that a fine is less intrusive than imprisonment). A court has great discretion to fashion an appropriate sanction, using its understanding of the case as a basis for imposing those sanctions. *Glover v. Johnson,* 199 F.3d 310, 312 (6th Cir.1999).

■ After reviewing the record in this case, the Court declines to impose monetary sanctions on Defendants, a remedy requested by the Plaintiffs, as this is certainly not in the interest of justice.[124] Nevertheless, the Court, in its role as a court of equity, may fashion a remedy to ensure compliance with federal law. Because the TennCare program has proven to be unable to ensure that the under–21 population receives EPSDT-compliant services, the Court orders the Defendants to carve out the under–21 population from the larger pool of TennCare recipients. In order to ensure compliance with federal law, and to determine the precise contours of a carve out for the under–21 population, the Court will appoint a special master to draft an EPSDT-compliant plan for children less than 21 in Tennessee, as discussed in more detail below.

### F. Special Master

■ Plaintiffs request that the Court appoint a special master for the purpose of "assisting the Court to ensure compliance."[125] Under Federal Rule 53, "[t]he court in which any action is pending may appoint a special master therein." Fed. R.Civ.P. 53(a). However, "[a] reference to a special master shall be the exception, not the rule … [and the Court's authority to appoint a special master is limited to] exceptional circumstances." Fed.R.Civ.P. 53(b). *See McCormick v. Western Kentucky Navigation, Inc.,* 993 F.2d 568, 569 (6th Cir.1993). The use of a special master to ensure compliance with a court's remedial order is well-established. *See Reed v. Rhodes,* 635 F.2d 556 (6th Cir.1980)(upholding the use of an "administrator of desegregation"). The Court may appoint a special master for a variety of reasons, including the "problems associated with compliance with the district court order." *United States v. Suquamish Indian Tribe,* 901 F.2d 772, 775 (9th Cir. 1990). However, the appointment of a special master to ensure the implementation of a court order by a government entity is "an extraordinary remedy." *United States v. City of Parma, Ohio,* 661 F.2d 562, 578–9 (6th Cir.1981).

---

**124.** The Court finds that having a State agency pay a fine is wasteful of State resources, and would be an irresponsible use of taxpayer money. Even if the State was in contempt of Court, the Court fails to see how paying a fine would in any way address the underlying issue that caused the State to be in contempt in the first place. The problem with TennCare is not money, but the system itself.

**125.** Pl. Pretrial Br. at 16

Nevertheless, "courts have long recognized their inherent powers to provide themselves with appropriate instruments for the performance of their duties, including the authority to appoint persons unconnected with the court, such as special masters ... with or without the consent of the parties." *Ex Parte Peterson*, 253 U.S. 300, 314, 40 S.Ct. 543, 64 L.Ed. 919 (1920); *Reed v. Cleveland Bd. of Educ.*, 607 F.2d 737, 746 (6th Cir.1979)(authority to appoint "expert advisors or consultants" derives from either Rule 53 *or court's inherent authority* ).

The Court will, under its inherent equitable authority, appoint a special master to facilitate the implementation of an EPSDT-compliant State Medicaid plan. The special master is charged with working with the parties to develop, through mediation, an EPSDT-compliant system for the under-21 population in Tennessee.

The Defendants claim that the appointment of a special master in this situation would violate recent Supreme Court precedent. In *Lewis v. Casey*, 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), the Supreme Court held that "it is not the role of court, but that of political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution." This Court heeds the Supreme Court's decision, and in appointing a special counsel, the Court only intends to enable to an outside entity to foster a dialogue between Plaintiffs and Defendants, and to ultimately fashion a system that comports with EPSDT.

In *Lewis*, the Court held that the District Court's appointment of a special master was an overly intrusive remedy, in light of the fact that the Court charged the special master with devising a remedial plan, and severely limited the remedies that the master could choose. *Id.* at 363, 116 S.Ct. 2174. However, this Court does not severely limit the remedies that the special master may choose in this case. In addition, the special master is specifically charged with mediating an EPSDT-compliant plan. Second, the *Lewis* case involved prison litigation, where the Court's remedy completely overrode the State's discretionary policy-making. The Supreme Court based its decision on the District Court's failure to accord adequate deference to State prison officials: first, the Court disapproved of the District Court's finding that the administrative restrictions on lockdown prisoners' access to law libraries was unjustified. Second, the Court found that the injunctive Order was "wildly ... obtrusive". *Id.* at 361, 116 S.Ct. 2174. Third, the Court found that the Order was "developed through a process that failed to give adequate consideration to the views of state prison authorities." *Id.*

The Court notes the concerns discussed in *Lewis*. However, those concerns are not applicable to the circumstances in this case. This Court only orders that the special master craft a plan, by mediation of the parties' positions, that addresses an area that the State has been repeatedly unable to address. In *Lewis*, the majority opinion specifically stated that the Court must give prison officials an opportunity to correct internal errors. *Id* at 364 n. 8, 116 S.Ct. 2174 (criticizing the dissent for misstating the holding of earlier Court precedent, mandating that the Court allow the State an opportunity to correct errors). In addition, the special master's charge is not wildly intrusive. Instead, the Court charges the special master with a limited task—fashioning an EPSDT-compliant system with the aid of the parties. While this is certainly a large task, it is not a wildly obtrusive remedy that contemplates the Court becoming enmeshed in the minutiae of government operations in the name of the Constitution. *Id.* at 361, 116 S.Ct. 2174 (internal citations omitted). Finally, the Order was developed through a

process that gives ample consideration to the positions of State officials. Indeed, not only has the State had an ample opportunity to inform this Court of its views, but·it has had an opportunity, over the past three years, to correct the errors that led to the imposition of the Consent Decree in the first place. In addition, the State will have an opportunity to inform the special master of its viewpoints, and ultimately work with the special master, through mediation with the Plaintiffs, to craft an EPSDT-compliant system. Therefore, although this Court takes note of *Lewis*, that decision does not limit the ability of this Court to appoint a special master, to be chosen by both parties, to ultimately craft an EPSDT-compliant system with the advice and input of both parties.

The Court recognizes that the systemic deficiencies associated with the TennCare program make compliance with the EPSDT mandate nearly impossible. Defendants continue to contend that a deliberate process of trial and error will ultimately produce an EPSDT-compliant system. However, this very process has failed to produce an EPSDT-compliant system. Thus, while the Court hesitates to second-guess the elected branch of State government, it will do so in this instance. The Court does not doubt that Defendants are well-intentioned and knowledgeable. However, EPSDT cannot wait for the State to perfect a system that is inherently ill-suited to provide EPSDT services. That is precisely why Defendants require an outside entity to comply with a duty that transcends the Consent Decree. However, The Court does not possess the technical expertise to adequately assure both compliance with the Consent Decree's requirements and the federal EPSDT mandate. The appointment of a special master with expertise in this area would allow the Court to adequately supervise the implementation of an EPSDT-compliant plan

for all State residents under the age of 21.

The special master shall, with the input of both Defendants and Plaintiffs, draft an EPSDT-compliant plan for the carved-out under 21 population. Upon Court approval, that plan shall be immediately implemented by Defendants. Specifically, the special master shall use his or her expertise to develop a system, perhaps modeled after another State's system, that both comports with the State's duties under the Medicaid law and Medicaid Waiver and the EPSDT law. The special master shall, with the input of both parties, recommend to the Court a specific plan for ensuring EPSDT compliance.

### Part Two. Defendants' Proposed Revisions

**A. Defendants' Revised Remedial Plan– Findings of Fact**

1. Pursuant to the Consent Decree, the parties were to submit a specific remedial plan addressing the coordination and delivery of services under EPSDT law for children in State custody or at risk of entering State custody. After extensive negotiations, the parties jointly submitted a Remedial Plan for Children in State Custody and the Plan for Children at Serious Risk of Entering State Custody (collectively, "Remedial Plan") on May 11, 2000. The Court approved the Remedial Plan on May 16, 2000, in two Agreed Orders. (Doc. Nos.58, 60).

2. The May, 2000 Agreed Orders imposed on the Defendants several requirements designed to improve the care of children in, or at risk of entering, State custody. The children became a subclass that was to be carved out from the larger class implicated by the Consent Decree. The Remedial Plan had four basic components. First, Defendants were to develop a Best Practice Network (BPN) comprised of primary care providers and other health

care resources. The BPN would coordinate the dissemination of medical and behavioral health services to children in the subclass.

3. The second component involved the development of five Centers of Excellence (COE), designed to improve the delivery of services at a tertiary level of care. The COEs were to have a dual function: monitoring of the Best Practice guidelines and BPN providers, and serving as a reference point and "safety net" for local providers when those providers needed assistance in diagnosing or managing a child's health problems.[126]

4. Third, the plan contemplated the creation of an Implementation Team in the State Health Department. The Implementation Team was to have a variety of functions. Primarily, the Implementation Team was to serve as a swat team for children at risk of entering State Custody. The Implementation Team was to review individual cases with a variety of organizations to ensure that appropriate services were provided to the child in a timely fashion. All care deemed necessary by the implementation team would be charged to the BHO, subject to the TennCare appeal process.[127]

5. The last component of the Remedial Plan was an oversight function. The Remedial Plan contemplated the establishment of a Steering Panel, comprised of various advocates and other entities, including both Plaintiffs' and Defendants' counsel.[128] Final decision-making is vested in the Executive Oversight Committee, which includes counsel for both parties, DCS and DOH representatives, consultant Paul Demuro, and a representative for a Center of Excellence.[129]

6. Soon after the entry of the May 2000 Agreed Orders, the Remedial Plan proved to be unworkable. The State created the Implementation Team, which was headed by a capable pediatrician, Dr. Larry Faust. Dr. Faust began recruiting for the Best Practice Network in May, 2000, by contacting pediatricians all over the State via e-mail, telephone, and in person, and also spoke to Steering Panel members.[130] The Steering Panel was appointed, and subcommittees were formed.[131] The Steering Panel and the Executive Oversight Committee met frequently.[132]

7. However, the State has not fully adhered to the Remedial Plan. First, the State was unable to recruit sufficient physicians for the BPN.[133] The providers were hesitant to contract with the State's MCOs because of past negative experiences with the MCOs.[134] The State was unable to contract with COE's because they, too, had concerns about dealing with the MCOs and about ultimately serving as "safety nets."[135] These concerns were not unfounded, given the fact that Xantus was in receivership and Access MedPlus went into supervision.[136] Hence, the Remedial Plan was never fully implemented.

126. Wadley Test., Trans. (Vol.I), pp. 108–110; Faust Test., Trans. (Vol II), p. 195–6; Doc. No. 60.

127. Doc. No. 60, p. 23.

128. Wadley Test., Trans. (Vol.I), pp. 111, 121–26.

129. *Id.* at 111–112.

130. Faust Test., Trans. (Vol.II), pp. 186–87.

131. Wadley Test., *supra*, p. 113.

132. *Id.* at 126–27.

133. Demuro Test., Trans. (Vol.II), p. 312–13; Faust Test., *supra*, p. 188.

134. Zelizer Dep. (Pl Exh. P 38), p. 68–70.

135. Demuro Test., *supra*, at 313–14; Wadley Test., *supra*, at 132–34.

136. Def. Proposed Findings of Fact and Conclusions of Law, p. 10. The Court notes that Access Med Plus is no longer part of the TennCare system.

8. The State has now proposed a revised Remedial Plan. Central to the State's proposed revisions is a "carve-out" for the delivery of health services to children in State custody. The plan contemplates that these children will be enrolled in a single MCO and BHO,[137] rather than being distributed among all of the TennCare contractors. As of July 1, 2001, the State has already reassigned all children in State custody to TennCare Select, to be administered by BlueCross.[138]

9. The State believes that limiting the plan to only one MCO and one BHO will address many of the problems that providers had with the original Remedial Plan, including the hassle of having to deal with multiple TennCare contractors.[139] The Revised Remedial Plan also allows advocates other than DCS to make referrals to the Implementation Team,[140] and requires the State to contract with an advocacy group to make available additional resources for concerned individuals seeking to access services for children at risk of entering State Custody.[141] Although the Revised Remedial Plan proposes other changes, the forgoing are the most salient proposals.

10. The Revised Remedial Plan was formally approved by both the Steering Panel and the Executive Oversight Committee, with only Plaintiffs' counsel and an advocate disapproving.[142] The State has begun to move forward with its plans for the Revised Remedial Plan by working with BlueCross to develop the infrastructure necessary to create the Best Practice Network.[143] The State opines that only this Court's Order is necessary for it to proceed with the Revisions.

*B. Revision of Consent Decree, including the Remedial Plan–Conclusions of Law*

■ Rule 60 of the Federal Rules of Civil Procedure allows a court to "relieve a party … from a final judgment, order, or proceeding … [when] it is no longer equitable that the judgment should have prospective application." Fed.R.Civ.P. 60(b)(5). The Supreme Court announced its rule for the modification of institutional consent decrees in *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992). In *Rufo,* the Court held that a party seeking modification of a consent decree must show that "a significant change in circumstances warrants revision of the decree." 502 U.S. at 383, 112 S.Ct. 748. The party seeking modification may meet its initial burden by "showing either a significant change in factual circumstances or in law." *Id.* Modification of a consent decree is appropriate: (1) "when changed factual conditions make compliance with the decree substantially more onerous," (2) "when a decree proves to be unworkable because of unforeseen obstacles," or (3) "when enforcement of the decree without modification would be detrimental to the public interest." *Id. Accord Vanguards of Cleveland,* 23 F.3d 1013 (6th Cir.1994); *Lorain NAACP v. Lorain Bd. of Educ.,* 979 F.2d 1141, 1148 (6th Cir.1992). But "modification should not be granted where a party relied upon events that actually

---

**137.** The MCO will be Blue Care Select, and the BHO will be Advocare.

**138.** In fact, the record indicates that the idea of carving out children in custody may have actually originated with BlueCross. Wadley Dep., p 34, p. 132.

**139.** Faust Test., *supra,* p. 201.

**140.** Wadley Test., *supra,* p. 146–47.

**141.** Demuro Test., *supra,* p. 322.

**142.** Wadely Test., *supra,* p. 140–41.

**143.** Def. Proposed Findings of Fact and Conclusions of Law Re: Motion to Modify Remedial Plan, p. 14.

were anticipated at the time it entered into a decree." *Id.*

Here, the State Defendants moved for a modification of the May 2000 Agreed Orders. (Doc. No. 63). In addition, Defendants claim that the Remedial Plan is unworkable, and assert that their proposed modifications "further the intent of the original parties in a more efficient way." (Def. Pretrial Br., Doc. No. 123, p. 9). In support of their Motion, Defendants cite problems associated with convincing providers to participate in the TennCare program, and the large population of children with unmet needs. However, Defendants do not cite any authority for the proposition that a Consent Decree may be vacated upon the unwillingness of providers to sign up to a program that may not be in those providers' own interest. In fact, this has been a problem from the inception of the TennCare program.[144] Defendants fail to demonstrate how the alleged barriers to implementation represent a "changed factual circumstance" or "unforseen obstacle" that would warrant modification of the Decree or the Remedial Plan, as per *Rufo.* The facts indicate that Defendants were aware, long before filing their Motion to Stay the Enforcement of the Remedial Plan, that providers were unwilling to participate in some TennCare managed care organizations. In fact, this was documented in the 1998 DeMuro Report.[145] The Court does not find the existence of a substantial change in circumstances.

The Court agrees that the current Remedial Plan is unworkable, and that modification may, in theory be appropriate. However, the Court is not convinced that the Revised Remedial Plan adequately addresses the main problems associated with the original Remedial Plan. Specifically, the managed care structure of TennCare may create the problems encountered by

and among the State, MCOs and BHOs and providers. The new remedial plan does nothing to assuage the providers' distrust of the MCOs. The Revised Remedial Plan also does not address the apparent disconnect between the Bureau of TennCare and the Implementation Team at the Department of Health. A new Remedial Plan that still operates under the very same managed care system may not adequately address the Court's concerns with the TennCare system as it relates to the under 21 population. The Defendants have not made a showing of how the Revised Remedial Plan will ultimately succeed where the current Remedial Plan has failed.

The Court also does not find sufficient reasons for modifying any part of the Consent Decree at this time, for the reasons discussed in relation to the Agreed Orders. The Defendants have failed to show how the factual situation in this case mandates revision of the Consent Decree under the *Rufo* test.

However, as discussed below in Part Three, the special master will have the authority to craft an EPSDT-compliant plan for all TennCare recipients under the age of 21 in Tennessee. The Special master shall also consider the proposed carveout for children in State custody to determine whether the proposed Revised Remedial Plan or any different Remedial Plan would adequately address the health care needs of children in or at risk of entering State custody.

### Part Three. Conclusion: The Special Master's Responsibilities

The special master is charged with developing a workable, EPSDT-compliant system for all TennCare recipients under 21. As part of that charge, the special master shall also consider the specific

---

144. *See, e.g.* Tighe Test., *supra,* p. 87

145. Pl. Exh. 0–5, p. 23.

problems associated with children in, or at risk of entering, State custody. Until that time, the Consent Decree and May 2000 Orders will remain unchanged.

The special master, appointed under this Court's inherent powers, is specifically charged with both mediation between the parties and, ultimately, the drafting of an EPSDT-compliant plan for the provision of medical and mental health services (under the TennCare waiver, or otherwise), to the under–21 population of Medicaid-eligibles and other TennCare enrollees in Tennessee. The special master shall be chosen by both parties. In the event that the parties are unable to agree on a special master, each party shall submit three nominees to the Court for the Court's consideration. The special master shall conduct a mediation with both parties in order to develop an EPSDT-compliant plan. The plan shall also contain necessary revisions to the Consent Decree and the Remedial Plan. In the event that the mediation does not produce a mutually-agreeable plan, each party shall then draft a plan that both complies with EPSDT and addresses this Court's problems with the current TennCare plan's provision of services to the under 21 TennCare population, as discussed in the first part of this opinion. The plans shall include appropriate revisions to the Consent Decree and the Remedial Plan. After the special master has considered both plans, the special master shall conduct a mediation to attempt to reconcile the plans. The special master shall ultimately, with the advice of both parties, draft and submit to the Court an EPSDT-compliant plan for the provision of medical and mental health services to children in the Plaintiffs' class. In addition, the plan shall specifically address the needs of children in, or at risk of entering, State custody. The special master's plan shall either supplement or replace the Consent Decree and Remedial Plan, depending on the assent of both parties. In either case, the EPSDT-compliant plan shall be binding on the Defendants.

The Court bases this remedy on its equitable power to appoint an expert/ special master. The Court finds that the importance of the situation merits the imposition of a special master to mediate an ultimate solution to the EPSDT deficiencies inherent in the TennCare program. Although the Court's remedy is broad, it is well within this Court's equitable power. "Congress knows how to deprive a court of broad equitable power when it chooses to do so. It did not choose to do so in this instance." *Stanton*, 504 F.2d at 1251 (*citing Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 94 S.Ct. 1028, 39 L.Ed.2d 123 (1974)).

The Court recognizes that Defendants have attempted to comply with the Consent Decree. The Defendants continue to struggle with the TennCare system, more than seven years after it began. However, attempts to comply are simply not enough where the healthcare of children is involved. The Consent Decree is rooted in the federal EPSDT mandate, which recognizes the importance of early screening, diagnosis and treatment to the well-being of healthy children and adults. The Court will not find Defendants in contempt of Court at this time, for the reasons discussed above. The Court reserves the right to find Defendants in contempt in the future. Although Defendants have made strides in attempting to comply with the federal EPSDT standards, a special master is necessary to assure that Tennessee provides the healthcare that care that Congress envisioned more than thirty years ago, when EPSDT provisions were first enacted. Tennessee is not the only State that has failed to comply with federal EPSDT requirement,[146] and it will not be

---

**146.** *See e.g.; Frew supra* (finding a violation of EPSDT consent decree); *Emily Q. v. Belshe,*

the last. However, the very State that helped create the model for the creative use of managed care in the Medicaid context, now has the opportunity to lead the nation again, by ensuring that every eligible child receives proper EPSDT services. With the cooperation of all parties involved and the Court's continued supervision, that opportunity may become a reality.

No. 98–4181–WDK (C.D.Cal., May. 5, 1999)(expanding the availability of EPSDT mental health services); *French v. Concannon*, No. 97–CV–24–B C (D.Me. July 16, 1998)(consent decree requiring improvement in delivery of EPSDT to children with disabilities); *Sanders v. Lewis*, 1995 WL 228308, No. 2:92–0353 (S.D.W.Va., March 1, 1995). *See* *also Dajour B. v. City of New York,*, No. 00–CIV.2044 (JGK), 2001 WL 1173504 (S.D.N.Y., October 3, 2001)(certifying class of asthmatic children under 21 who are or will be in emergency shelter in New York, and recognizing that claim is based on failure of City to meet EPSDT obligations).